UNITED STATES of America,
Plaintiff–Appellee,

v.

Joseph SEHNAL, Defendant–Appellant.

No. 90–10012.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 1991.

Decided April 17, 1991.

Stephen E. Silver, Burch & Cracchiolo, Phoenix, Ariz., for defendant-appellant.

Wallace H. Kleindienst, Asst. U.S. Atty., Phoenix, Ariz., for plaintiff-appellee.

Before SCHROEDER, CANBY and NOONAN, Circuit Judges.

NOONAN, Circuit Judge:

Joseph Sehnal appeals his conviction of violating 26 U.S.C. § 7206(1) by making false statements on two corporate tax returns filed by Scorpio Steel, Inc. (Scorpio). He also appeals the denial of his motion for acquittal on charges of making false statements on two personal income tax returns—charges as to which the jury could not agree. We affirm the conviction. We dismiss for want of jurisdiction the appeal of the denial of the motion for acquittal.

### THE EVIDENCE

At the age of 22, Joseph Sehnal came to the United States from Czechoslovakia in 1970, knowing no English. In November 1978 he started his own steel fabricating company, Scorpio, of which he was the sole stockholder and chief executive. Scorpio shaped and cut steel for building construction and sometimes installed the steel it sold. Scorpio through Sehnal normally did business by oral contracts—an exchange of words and a handshake would suffice. The business, located in Phoenix, Arizona, prospered. By 1979 Sehnal was being paid a salary of $14,000 by the corporation; by 1980 his salary had increased to $45,000.

Sehnal and his wife Susan were trustees of a bank account for his six-year old son, Dennis. In September 1980 an IRS agent inquired as to deductions Scorpio had made for personal expenses of the Sehnals. Shortly thereafter Sehnal opened a new trust account, designating himself as sole trustee for his son, Dennis. He used a different branch of his regular bank and Scorpio's business address as the address for the account. In the next thirteen

months Sehnal deposited thirteen checks into this account.

The chief source of money for these deposits was Mohawk Bridge and Iron Co. Mohawk in 1980–1981 was engaged in erecting steel structures for a general contractor. Its president, Claud Hill, made three oral contracts for fabricated steel with Scorpio. In Hill's words a contract for fabricated steel was complete when the steel was delivered.

When it came to payment, Hill broke the checks as follows:

9/15/80—$18,650 to Joseph Sehnal and $5,000 to Scorpio.

1/7/81—$9,816 to Joseph Sehnal and $19,000 to Scorpio.

9/17/81—$4,400 to Joseph Sehnal and $15,600 to Scorpio.

At Sehnal's request, Hill's wife, the bookkeeper of Mohawk, entered on the check stubs a description of the purpose of the checks going to Sehnal as "consulting fees" or "consulting engineering fees." Hill, however, testified that Sehnal rendered no consulting or engineering services to Mohawk.

All of the checks from Mohawk to Joseph Sehnal were deposited by Sehnal in Sehnal's son's trust account, as was the $15,600 check made out to Scorpio.

Building up the trust account in this way from Mohawk and other companies with which Scorpio did business, Sehnal had at his disposal there approximately $50,000. Over the next eighteen months he gradually withdrew about $35,800 from the trust account and deposited the money in a personal checking account in the name of himself and his wife. On October 31, 1981, he then withdrew $30,000 from the checking account and purchased in his own name five acres of land in South Phoenix. He obtained a permit to construct a corporate building on the land.

On February 18, 1982 Sehnal opened a new checking account in his name doing business as "Desert Properties." On March 15, 1982 he transferred $3,500 from the trust account of which he was the sole trustee to the Desert Properties account.

He thereafter transferred $19,600 over the next three months from the trust account to this account. The money was largely used to pay for labor and materials in constructing a corporate building on the five acres of land. On the completion of the building in 1982 Sehnal leased the land and building to Scorpio at a yearly rate of $22,800.

The balance of the funds originally deposited in Dennis Sehnal's trust account of which Sehnal was sole trustee was spent by the Sehnals on ordinary living expenses.

In February 1982 IRS agent Laura Samson began an audit of Scorpio's 1980 corporate return. She determined that Scorpio had taken a number of improper deductions for personal expenses of the Sehnals. As a result of this audit, Sehnal discharged his outside auditor-bookkeeper, Hy Spivack.

In August 1982 agent Samson met Sehnal's new accountant, Jonathan Grice. She suggested that Scorpio switch from a cash basis method of accounting to a completed contract method for the corporate tax return due February 28, 1981. The suggestion was accepted. The return was eventually filed on November 15, 1982. There was an understanding between Samson and Grice that certain problem areas could be adjusted after the return was filed. According to Samson, these areas related to travel and entertainment deductions. According to Grice, it was his understanding that income could also be adjusted. Grice informed Sehnal before Sehnal signed the return that it would be audited.

On the corporate returns of Scorpio for the fiscal years ending February 1981 and February 1982 and signed by Sehnal there was no report of the checks deposited in Dennis' trust account. On Sehnal's personal income tax returns for the calendar years 1981 and 1982 there was no report of the checks deposited in Dennis' trust account. Neither Spivack nor Grice was informed of these checks at the time they prepared the returns.

## THE CONDUCT OF THE CASE

The government presented witnesses from the companies which had dealt with

Sehnal. They testified that the checks deposited in the son's trust account were checks issued in payment for steel delivered by Scorpio. The government also presented the testimony of Laura Samson and other IRS agents involved in the investigation. Most tellingly, the government presented the testimony of Hy Spivack, who testified that he had prepared the 1981 corporate return and the 1981 and 1982 personal tax returns. He testified that he told Sehnal that if cash was not deposited in the corporate account it would not be reported to the IRS on the corporate return. He also testified that Sehnal did not show him any of his personal bank account records.

Sehnal did not take the witness stand. The defense challenged the credibility of Spivack. The defense tried to suggest that Sehnal could have rendered personal consulting services to the purchases of Scorpio's steel. The defense put on an expert witness to say that Scorpio was indebted to Sehnal and that the sums diverted from the corporation could have been the repayment of unrecorded loans. The defense emphasized Grice's testimony that the 1982 corporate return was filed with an agreement with the relevant IRS agent to adjust income.

Addressing the jury, the prosecutor stated that the government had to prove four things: (1) that Sehnal had signed his name to a tax return false in some material matter; (2) that the return had a declaration that it was signed under the penalty of perjury; (3) that Sehnal knew the return was false as to the material matter; and (4) that Sehnal had acted willfully. The prosecution said the only dispute was whether he had done so willfully. The prosecutor then elaborated on the evidence of deliberation, deviousness and deceit that showed Sehnal had concealed the trust account of which he was the sole trustee. At the same time the prosecutor pointed to Sehnal's intelligence and determination in building a business from scratch, so that it was impossible to think of him as a person totally unsophisticated in financial matters. The government pointed also to his motive: that the trust account was set up just after the Internal Revenue Service had begun to question the personal expenditures written off against the corporate income and that the trust account was set up in the year when the business had suddenly taken off and Sehnal had tripled his salary. The prosecutor said:

Mr. Sehnal, when he put the money in his own pocket in his own trust account, knew when he signed the return that none of those monies were reported to Mr. Spivack, showed up in the W–2 form in the way that the other monies did.

Indeed, this chart shows us that for both of those years, no—unreported $45,-000.00 on the—his personal income tax return, he had not reported about half that money. A big enough sum so when he looked at the return and the figures written in there by Mr. Spivack, knew that that didn't include almost half again what he had made.

He couldn't make a mistake or be mistaken about that as to the personal return for 1980. Again in 1981 he signed a return telling the IRS that he only made $52,000.00, when in fact he again made twice as much again that he didn't report.

At the climax of his argument the prosecutor said to the jury, referring to defense counsel Stephen E. Silver, "As you listen to Mr. Silver's argument, I want you to think about these questions. And when you listen to his argument, ask him, to yourself if he's answered these questions to your satisfaction. Ask him these hard questions."

The prosecutor then proceeded to ask a number of questions directed at Silver, adding the observation that Silver "has no burden to do anything in this case. He can sit on his hands in his chair and not make one word at all. It's the government's burden. But when he stands up, ask him if he's explaining to you why it is that none of these monies found their way into the corporate bank account."

After a series of questions in which it is unmistakable that Silver is being asked to explain the evidence, the prosecutor used several questions where the pronouns "he"

and "him" are used in such a way that, while the prosecutor was continuing his imaginary colloquy between the jury and Silver, the pronouns also clearly refer to Sehnal, so that there is confusion. Here are three of these questions:

Ask him, if it's true, why did he set up the Desert Properties account, to funnel the money in another account, if there's nothing to hide. Ask him that question....

Ask him why it was that Miss Samson asked for his personal bank statements in 1983, why it took three months to get them to her.

In the end, ask Mr. Silver the hard question, is if this was all just a ruse, an idea to build the building for his corporation, why didn't he put the money into the corporation? ...

In the first question the "he" must refer to Sehnal although the first and last "him" in context refer to Silver. In the second question the first "him" refers to Silver while "his" refers to Sehnal. In the third question Silver is referred to but the "his" and the "he" refer to Sehnal.

Silver did not object to the prosecutor's line of argument. In his own closing, Silver declared that he, Silver, would not engage in a question and answer exchange with the prosecutor. His statement implied that he saw the prosecutor's questions as addressed to defense counsel.

Silver did question the disappearance of the notes of an IRS agent's interview with the clear implication that failure to explain the disappearance pointed to something being hidden by the agent. In rebuttal the prosecutor objected to Silver's "beating the government up, making you think the IRS is full of willful, wicked, evil people. The prosecutor continued, "It is not some monolithic entity bearing down on the taxpayer, they're human beings that work there. It's their job. And when they come in here and testify under oath, they take it seriously because it is the oath." Silver did not object to this response to his argument.

The jury returned a verdict of guilty as to both the 1981 and 1982 corporate returns. It failed to agree as to the personal return. Sehnal moved for a judgment of acquittal as to the personal returns, and the motion was denied. Sehnal appeals to this court from both the conviction and from the denial of the motion for acquittal.

## ANALYSIS

■ Because the denial of Sehnal's motion for acquittal is not a final judgment, we do not have jurisdiction to review that denial. *United States v. Carnes*, 618 F.2d 68, 70 (9th Cir.), *cert. denied*, 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980). This portion of Sehnal's appeal must be dismissed.

On appeal, Sehnal's main argument is directed at the prosecutor's argument to the jury, principally to the questions the prosecutor invited the jury to ask.

*The Prosecutor's Overzealous Argument.* Tension exists between the privilege against self-incrimination and the natural response to the silence of the accused. "If someone is innocent, why doesn't he say so" is the average person's reaction to the silent defendant. Nonetheless, we have in our system made the decision that the right to remain silent is an important protection of the person against governmental inquisition or torture. As the right is important, it has been necessary to surround the right with some procedural protection in the course of the trial lest the right be effectively eroded by prosecutorial exploitation of the common reaction to silence. Consequently, it is long-established constitutional law that comment by the prosecution on the failure of the defendant to testify violates the guarantee of the Fifth Amendment. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Our court has developed a fine line separating comment on the defendant's failure to testify and the failure of the "defense" to explain the evidence. In a case involving the smuggling of watch movements, the three defendants did not take the stand. The prosecutor in his rebuttal argument said to the jury:

How about the other evidence in this case that demonstrates that no duties were paid? How about the evidence of Mr. Friedman sending the watches back and forth from New York to Switzerland? How about the way this business was conducted? I asked all the defendants, invited them in my opening argument, to please explain to you how this legitimate business transaction worked in the hotel in Los Angeles, and the transportation of the suitcases.

Did you hear an explanation from them? I invited them to give you one . . .

*United States v. Wasserteil*, 641 F.2d 704, 709 (9th Cir.1981). The court observed this argument could be interpreted as being directed at the defendants' lack of testimony but, "considered within the context," the argument was such that it was unlikely that the jury drew such a conclusion. In context, the argument could be understood as a reference to the lack of the explanation requested of the defense. The argument was, therefore, not in violation of the constitutional privilege. *Id.* at 704–10.

In *United States v. Castillo*, 866 F.2d 1071 (9th Cir.1988), the defendants were convicted of narcotics violations. They had not taken the stand. The government in argument to the jury commented on Castillo's failure to present any evidence that he had not lived in the apartment of coconspirator De La Renta. The prosecutor asked if the contention were true that he had not lived there, "What would be the testimony the defendants would present?" The prosecutor also commented on the fact that neither Castillo nor De La Renta had been shown to have any other job except running cocaine. The court held that the government had "commented on Castillo's failure to produce evidence and witnesses, not on his failure to testify." *Id.* at 1083. At the same time the court observed that, while precedent required it to hold that the government's argument did not violate the Constitution, "we do so under compulsion of the law of this circuit and with strong misgivings. . . . Repeated resort to the type of argument employed here may compel some court some day to conclude that the risk that this tactic will cause jurors to focus on the defendant's failure to testify is intolerable." *Id.* at 1083–84.

In our case the prosecutor's initial questions for the jury to ask Silver were, in context, questions addressed to "the defense" not the defendant. They were not an ideal way of putting the government's case. They fell within the line of argument accepted in *Wasserteil* and *Castillo*, but at the same time warned against in *Castillo*.

The prosecution went on to overstep the boundary and to present argument that could easily have been understood as a comment on the defendant's failure to testify. The prosecution slipped in its use of pronouns so that questions that it claims were posed to Silver could have been read as posed only to Sehnal. The prosecution asked questions whose answers could only have been provided by Sehnal. Doing so, the prosecution violated the standard set in *Lincoln v. Sunn*, 807 F.2d 805, 810 (9th Cir.1987) (prosecutor's allusion to facts that were within the knowledge of only two people might be presumed to be a reference to the failure of one of them to take the stand). The questions we have quoted should not have been asked. Had objection been made, the court should have excluded them. The questions ran the risk of violating Sehnal's constitutional right of silence.

■ Defense counsel, however, did not object to the questions. On appeal, some effort is made to excuse this failure by citing the trial court's expressed wish not to have many sidebars or interruptions of argument on unrelated grounds. But this mild expression of hope by the court was not a barrier to defense counsel objecting to possibly unconstitutional comment. When defense counsel had objected at the beginning of the argument to another aspect of the prosecutor's argument, the objection had been sustained. When defense counsel—an able and experienced lawyer—chose to remain silent, he waived his objections. *United States v. Kennedy*, 714 F.2d 968 (9th Cir.1983), *cert. denied*, 465 U.S. 1034, 104 S.Ct. 1305, 79 L.Ed.2d 704 (1984).

On appeal, therefore, we could only reverse on the basis of these improper comments if the court's failure to check them constituted plain error. Under that standard the comments must have been "such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." *United States v. Young*, 470 U.S. 1, 16, 105 S.Ct. 1038, 1047, 84 L.Ed.2d 1 (1985); *United States v. Gwaltney*, 790 F.2d 1378, 1386 (9th Cir.1986), *cert. denied* 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987). To obtain the exceptional remedy of reversal in a criminal case on the basis of plain error there "must be a high probability that the error materially affected the verdict." *United States v. Bryan*, 868 F.2d 1032, 1039 (9th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 167, 107 L.Ed.2d 124 (1989). Reviewing the entire record as required by *Young*, 470 U.S. at 16, 105 S.Ct. at 1046–47, we conclude that there was not a high probability of the prosecutor's improper argument influencing the verdict and that there was no miscarriage of justice.

As the prosecution argued to the jury, there was no doubt at all that Sehnal had signed the corporate tax returns under a declaration of perjury and that he knew they were false. Sehnal's only real defense was that in good faith he had relied on the accountants Spivack and Grice. Spivack testified to the contrary of this defense because he testified that Sehnal had never told him of the trust account. Even if a juror disbelieved Spivack, disbelieving Spivack would not furnish positive evidence that Sehnal had relied on him. With Spivack's testimony discounted, a juror would be left only with the testimony that Sehnal had set up the trust account and had not reported as corporate or personal income the checks there deposited. IRS Agent Dugger's memorandum stating that Spivack had advised Sehnal to deposit the checks in his personal account was based on hearsay and the source of the hearsay appears to have been Heinton, Senhal's corporate counsel, who, although testifying as a defense witness, did not support this story. In any event, even if this hearsay were believed by the jury, it would not show that Sehnal was in good faith in relying on such advice.

As to the 1982 corporate return, there is little more question. If the jury believed Grice, there was an agreement between Grice and an IRS agent that the return be filed with the understanding that the income figures could be adjusted. But Grice also testified that at the time he made this agreement he had no knowledge at all of the checks in the trust account; nor did the agent.

The agreement could not have been intended to cover that hidden set of transactions. Sehnal, who had not informed Grice of the trust account, could not have in good faith relied on Grice's advice to sign when he had concealed from Grice this major amount of income, and he could not in good faith have believed that any vague reference to income would include income which to this point he had hidden from everyone concerned with his taxes.

We conclude that it is unlikely that the improper argument affected the jurors' evaluation of either Spivack's or Grice's testimony and that there is a high probability that the improper argument did not affect the jury's conclusion that Sehnal willfully filed false corporate returns for 1981 and 1982.

A variety of other issues have also been raised on appeal.

*Vouching.* Sehnal objects that the prosecutor vouched for the IRS witnesses. The passages from his rebuttal that we have noted were not objected to at the time. The failure to exclude them does not constitute plain error in terms of the standard just set out.

*Multiplicity.* The defense complains of "multiplicity" in charging Sehnal in counts 1 and 2 with falsification of his personal return and in counts 3 and 4 with falsification of the corporate returns. The argument is without merit. Offenses are separate if each requires proof of a fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1931). The government had the burden to show the income that was

the corporation's was not reported by it and the income that was Sehnal's was not reported by him. These were different facts. There was no multiplicity.

■ *Variance*. The defense contends that in the presentation to the grand jury the government proceeded on the theory that the corporate return for 1982 was based on a cash method of accounting and that the government presented the case to the petit jury on a contract completion basis. Such variance, if it occurred, was on an irrelevant issue. The government was not trying to show a deficiency in the tax paid but a falsity as to the items omitted. The method of accounting would not have affected the duty to include payments received for contracts completed. On either a cash basis or a contract completion basis, the items should have been reported.

■ *Wilfulness*. Finally, Sehnal attacks the instruction given by the trial court on wilfulness. The trial court refused to give a requested separate instruction that the defendant must have had "a specific intent to do something the law forbids" or "the specific intent not to do something the law requires to be done."

What the defendant sought comes from language approved by us in *United States v. Brooksby*, 668 F.2d 1102, 1104 (9th Cir. 1982). But the court did instruct the jury in these terms:

An act is done willfully if done voluntarily and intentionally with the purpose of violating a known legal duty.

The instruction is taken from the *Manual of Model Jury Instructions for the Ninth Circuit*, § 5.05 at 76 (1989). It is a definition recently approved by the Supreme Court. *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). In substance it gave the same direction to the jury that the language proposed by the defense had sought.

A properly instructed jury, with ample evidence placed before it concluded that Joseph Sehnal was guilty of filing two false corporate returns. The prosecution presented a clear and convincing case and made, for the most part, a proper and

spirited argument to the jury. The prosecution came close to jeopardizing its case through overkill in its argument. The case, however, was strong enough to preclude any finding of plain error.

AFFIRMED as to convictions; DISMISSED as to the appeal from the denial of the motion of acquittal.