**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Pablo MAYANS, Defendant–Appellant.**

**No. 92–50530.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 7, 1993.

Decided Feb. 9, 1994.

Michael J. Lightfoot, Talcott, Lightfoot, Vandevelde, Woehrle & Sadowsky, Los Angeles, CA, for defendant-appellant.

Stephen Madison, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellee.

Before: FLETCHER and D.W. NELSON, Circuit Judges, and WILL,* District Judge.

FLETCHER, Circuit Judge:

On January 14, 1992, Los Angeles police officers arrested ten persons subsequently charged in an eight-count drug trafficking indictment. The five cocaine buyers and the sellers' "mule," Andres Ortiz, were all arrested in the act of consummating a drug deal; three others belonging to the cocaine selling group were arrested at or in the course of leaving an apartment, located on Otis Ave-nue, which Ortiz had visited just before the deal. Appellant Pablo Mayans was arrested as he drove up and down the street in front of the Otis apartment several hours after the first group of defendants had been arrested. Mayans' family owned the apartment.

Most of the defendants pled guilty; Mayans, along with two others, went to trial. The government's case against Mayans was largely circumstantial. The government showed that both the Otis apartment and another residence owned by Mayans' family had been used as stash houses by the cocaine sellers; that on January 9 and January 14, 1992, Mayans was observed in heated conversation with Ortiz at Benji's Auto Sales, where Ortiz appeared to work; that on the afternoon of January 14, Mayans went to the Otis apartment while Ortiz was there; and that Mayans turned up at the apartment again after the deal had gone awry. The government also introduced evidence (discussed more fully below) of prior drug deals between Mayans and three of the buyers.

The defense disputed or attempted to provide exculpatory explanations for much of the government's evidence. The defense showed that Mayans often went to Benji's to collect rent from a delinquent tenant; the defense also disputed that Mayans had gone to the Otis apartment on the afternoon of January 14, and submitted alibi evidence on this point.

The jury convicted Mayans on one count of conspiracy to distribute and possess with intent to distribute cocaine, and two counts of possession of cocaine. Mayans' appeal is based on five purported errors occurring in the course of trial.[1]

1. *Withdrawal of Interpreter*

Mayans used an interpreter until the very end of trial; the error he complains of occurred when he took the stand and the trial judge withdrew the interpreter. Initially testifying through the interpreter, appellant stated that he was born in Cuba, had been in the United States since 1971, and spoke En-

---

* Honorable Hubert L. Will, Senior United States District Judge for the Northern District of Illinois, sitting by designation.
1. The appeals of co-defendants Apolunio Felix and Javier Leon–Corrales, which are based on the district court's denial of their motions to suppress evidence, are treated in separate memorandum dispositions.

glish. The district judge at that point broke in with "Let's try it in English," observing that appellant had been in this country longer than he had been in Cuba, and that testimony takes "twice as long" with an interpreter. Tr. at 1190. Appellant's counsel objected, stating that appellant could not express himself in English. The judge responded by asking counsel repeatedly to "try it." Tr. at 1191. Counsel withdrew appellant as a witness, and asked for a sidebar. The court denied that request.

Since appellant had been the last witness for the defense, the government then put on its rebuttal case. After rebuttal, defense counsel moved to reopen and to put Mayans on the stand, presumably without an interpreter this time. The court refused to reopen after rebuttal, and shortly thereafter explained again that appellant had been in the United States longer than in Cuba, and that appellant's brother, who had testified without an interpreter over defense objections, had had no trouble handling himself. Subsequently, the defense moved for a mistrial on the ground that defendant had been denied an interpreter. The court denied the motion.

The issue was raised one final time by the prosecutor, who advised the court that in order to avoid creating grounds for appeal, the government would not object to reopening the case and allowing Mayans to testify. The court refused to do so, but did ask Mayans (through an interpreter) whether he had agreed with his attorney's initial decision to withdraw him as a witness. Mayans stated that he had. Apart from the initial colloquy which led to the withdrawal of the interpreter, Mayans did not testify.

## 2. *Prior Bad Acts*

Shortly before trial began, the government announced that it would call as witnesses three of the buyer co-defendants who had entered into plea bargains with the government—Vernon Neal Smith, Sidney Harmon, and Akil McElhannon. The government told the court that the co-defendants would testify about prior drug deals with appellant. Appellant objected to this evidence, and argued that at the very least the government should

be required to show that the co-defendants' testimony was admissible under Fed.R.Evid. 404(b) and 403. The government responded that the evidence was admissible to prove "other wrongs" under Rule 404(b) because it was probative of appellant's knowledge and intent, which the government expected to be in dispute. The government also said that the evidence was admissible to prove additional overt acts in the conspiracy charged. Appellant then asked the government for a more precise statement of what had allegedly occurred in the prior transactions, and the prosecutor agreed to give defense counsel all the information he had.

Whatever information changed hands, none was presented to the district court. The court, however, was satisfied that it had sufficient facts from which to determine admissibility, explaining to defense counsel that it did not need a "bill of particulars ... I'm telling you there was a meeting with your client in which he sold to them narcotics, cocaine ... What else do I need to know as to the relevancy of that?" Tr. at 15–16. The court then ruled that the disputed evidence could come in under either Rule 404(b) or the overt act theory.

At trial, Smith and Harmon both testified that a year and a half before the charged acts occurred, Mayans had appeared at an apartment in Inglewood where they were buying drugs from a dealer named Trino, and that Mayans had supplied multiple kilograms of cocaine—which they bought as well. McElhannon testified that two months before the charged acts, he had complained about defective cocaine he had bought from co-defendant Cristino Jacobo, and that Mayans had appeared, with Jacobo, to supply him with better quality drugs.

Smith also testified about conversations he had had with Mayans when the two of them were in jail following their arrest in this case. The remarks Smith attributed to Mayans strongly suggested that Mayans had been involved in the conspiracy.

## 3. *Cross-examination of the Buyers*

When defense counsel cross-examined the same three co-defendants, he sought to make

a detailed inquiry into their understanding of the plea agreements they had made with the government. Counsel was cut short by the judge before he had completed this line of questioning to his satisfaction.

### 4. *Prosecutorial Comments*

In his closing argument, the prosecutor, in referring to the January 9 and January 14 meetings between appellant and Ortiz at Benji's Auto Sales, described the nature of the interaction witnessed by police officers, and then twice stated that "there is no evidence to contradict that." Tr. at 1440–41. Appellant did not object to these comments.

### 5. *Relevancy Rulings*

#### (a) *Travel time*

As noted, appellant's case consisted in part of alibi evidence introduced to refute the government's assertion that he had been at the Otis apartment at 4:00 p.m. on January 14. The defense sought to show that appellant had been in his office all afternoon, and the prosecution essentially conceded in closing that he had been there at all times save from 3:50 to 4:27 p.m. At trial, appellant attempted to introduce the testimony of his brother Eugene concerning travel time from appellant's office to appellant's home—the latter of which was apparently very close to the Otis apartment.

The district court sustained the government's objection to this line of questioning, but later permitted the government to introduce testimony on the subject of travel time between appellant's office and the Otis location. The government made use of this travel time testimony in its closing, stating that since the trip took only 10 minutes, appellant would have had time to get to Otis Avenue and back to the office within the allotted time.

#### (b) *Wealth*

Over defense objections, the government was permitted to question appellant's wife about the Mayans family's real estate holdings (six apartment buildings, a restaurant, and a warehouse), and to elicit the fact that she and her mother-in-law each drove a Mer-

cedes. When defense counsel attempted to question appellant's brother about the source of the family's wealth, the court sustained the government's relevancy objection. The government referred to the family's wealth in closing.

## DISCUSSION

### 1. *Withdrawal of Interpreter*

▇ Under 28 U.S.C. § 1827(d)(1), a judge must order the use of an interpreter if the judge

> determines on [his or her] own motion or on the motion of a party that such party (including a defendant in a criminal case), or a witness who may present testimony ... speaks only or primarily a language other than the English language ... so as to inhibit such party's comprehension of the proceedings or communication with counsel or the presiding judicial officer, or so as to inhibit such witness' comprehension of questions and the presentation of such testimony.

Appellant argues that the trial court failed to observe both this statute and his constitutional right to testify on his own behalf.

Various cases have indicated that the use of interpreters in the courtroom is a matter within the trial court's discretion, and that a trial court's ruling on such a matter will be reversed only for clear error. *See, e.g., United States v. Lim*, 794 F.2d 469, 471 (9th Cir.), *cert. denied*, 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986). While many of these cases involve mere mechanical aspects of the use of interpreters, *see, e.g., Lim* (question of whether court could "borrow" an interpreter from counsel table to assist a witness), *United States v. Bennett*, 848 F.2d 1134, 1140–41 (11th Cir.1988) (question of whether each co-defendant should have his own interpreter), even the more fundamental question of whether an interpreter is necessary has been consigned to the "wide discretion" of the trial court. *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir.1973), *cert. denied*, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974).

In this case, however, we find ourselves in the peculiar situation of being unable to review the district court's determination that

appellant did not need an interpreter. The trial judge never conclusively made that determination, but rather urged appellant over and over to try testifying in English—to "try it." When appellant withdrew rather than making the attempt, the judge complained that he had never been given the opportunity to make a determination as to whether or not appellant had difficulty speaking English. Thus the trial judge himself apparently did not regard as conclusive the facts that appellant had lived in this country for 20 years and that appellant's brother had testified without difficulty—although he repeated those facts often enough.

■ We certainly agree that under the circumstances presented here, observing a witness "trying to" speak English is an indispensable part of the inquiry into whether or not an interpreter is needed. These circumstances include, most significantly, defense counsel's statement to the court that appellant "cannot express himself [in English]," Tr. at 1191 [2]—a statement nowhere contradicted in the record.[3] In the face of an uncontradicted statement that a defendant needs an interpreter, common sense dictates that a trial court must satisfy itself through personal observation that the defendant has no difficulty speaking English before the interpreter is withdrawn.

Here, the trial judge was foreclosed from making any such observation, since his method was to test appellant's language skills by withdrawing the interpreter—and after this was done, appellant chose not to testify at all. However efficient the district court's method for gathering the relevant information may have been, it created obvious problems. If appellant's English was weak enough that an interpreter was necessary, this fact would not have emerged until after appellant had exhibited some confusion or miscomprehension on the stand. By that time, the damage sought to be avoided by the interpreter statute would already have been done. Equally troubling, appellant's miscomprehension might never have been recognized as such: he might have made damaging responses to questions he misunderstood, and those responses might have been taken to be accurate.

■ Thus the trial court's error was in its insistence on evaluating appellant's language skills in the course of the trial itself, and in front of the jury, where the consequences of miscomprehension would have been grave indeed. The trial court was certainly entitled—indeed, required—to make a determination of appellant's linguistic abilities. Once properly made, that determination would have been entitled to considerable deference. The method the court employed, however, placed that determination, and therefore prematurely placed appellant, in a forum fraught with risk. Because this clearly undermined the purpose of the interpreter statute, we conclude that the statute was violated in this case.[4]

■ The district court's method, which virtually guarantees confusion or miscomprehension of a defendant who does not speak English well, also violated appellant's constitutional rights. Various cases have recognized a constitutional right to an interpreter. See Lim, 794 F.2d at 470 (acknowledging that several circuits have held that a defendant whose fluency in English is so severely

---

2. In light of that statement, we are frankly perplexed by the government's insistence at oral argument that defense counsel's remarks to the court were limited to the observation that appellant felt "more comfortable" in Spanish.

3. We note that while the government offered to introduce testimony which would contradict defense counsel's assertion, the court declined that offer. Det. Gutierrez, the arresting officer who had testified earlier, had said only that appellant spoke "some English"; moreover, Gutierrez himself noted that at his arrest, appellant "went to Spanish because he felt comfortable in Spanish." Tr. at 219.

4. The government suggests that this is not reversible error because defense counsel never requested a separate proceeding in which to evaluate appellant's language skills. Given the trial court's repeated refusals to hear defense counsel out on the issue, and the court's refusal to allow a sidebar when the issue first arose, we do not fault the defense for this omission. But even if we did, we would still review the challenged ruling, albeit under a more permissive, "plain error" standard. United States v. Dischner, 974 F.2d 1502, 1515 (9th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993); Fed.R.Crim.P. 52(b).

impaired that it interferes with his right to confrontation has a constitutional right to an interpreter); *Valladares v. United States,* 871 F.2d 1564, 1566 (11th Cir.1989) (suggesting that an inadequate interpretation may make a trial fundamentally unfair, and thereby implying that due process rights might be violated). While these cases have often been concerned with the role of interpreters in helping a defendant to understand those who testify against him, and hence have focused on the Sixth Amendment right to confront witnesses, the withdrawal of an interpreter whose assistance has been enlisted in order that the defendant may deliver his own testimony clearly implicates the defendant's Fifth Amendment right to testify on his own behalf.[5] Here, the interpreter was withdrawn despite appellant's claim that he still needed one, and despite the trial court's lack of information on the basis of which to determine otherwise. Appellant's only alternative to forfeiting his right to testify was to participate in the risky in-court experiment proposed by the trial judge. We conclude that under these circumstances, appellant's Fifth Amendment rights were violated.

▮ We recognize that in this area, as in many others, district courts have considerable discretion as to the manner in which they protect the defendant's constitutional right to testify and to confront witnesses. *Valladares,* 871 F.2d at 1566. With all due deference to that discretion, we hold nonetheless that a district court's observation of a testifying defendant's language skills to evaluate his need for an interpreter—an evaluation to which we have concluded appellant was entitled under the circumstances presented here—must initially be made outside the presence of the jury. We remand this case to the district court for a new trial because that was not done here.

## 2. *Prior Bad Acts*

▮ Fed.R.Evid. 404(a) prohibits admission of evidence of a person's character "for the purpose of proving he acted in conformity therewith on a particular occasion." Fed.

R.Evid. 404(b) states that other crimes evidence may be admissible for other purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." A trial court's admission of evidence under Rule 404(b) is reviewed for abuse of discretion. *United States v. Garcia-Orozco,* 997 F.2d 1302, 1304 (9th Cir.1993).

Recently, this court restated a 4–part test for the application of Rule 404(b): evidence of prior criminal conduct may be admitted if (1) the evidence tends to prove a material point; (2) the prior act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in cases where knowledge and intent are at issue) the act is similar to the offense charged. *Garcia-Orozco,* 997 F.2d at 1304 (citing *United States v. Bibo-Rodriguez,* 922 F.2d 1398, 1400 (9th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2861, 115 L.Ed.2d 1028 (1991)). In applying that test, this court has also recently stated that

> ... extrinsic acts evidence is not looked upon with favor. We have stated that our reluctance to sanction the use of evidence of other crimes stems from the underlying premise of our criminal justice system, that the defendant must be tried for what he did, not for who he is. Thus, guilt or innocence of the accused must be established by evidence relevant to the particular offense being tried, not by showing that the defendant has engaged in other acts of wrongdoing.

*United States v. Bradley,* 5 F.3d 1317, 1320 (9th Cir.1993) (internal quotation marks and citations omitted).

▮ With respect to the relevance requirement—the first prong of the 4–part test—the government "must articulate precisely the evidential hypothesis by which a fact of consequence may be inferred from the other acts evidence." *United States v. Mehrmanesh,* 689 F.2d 822, 830 (9th Cir.1982). When the government's theory is one of knowledge—as here—this court has emphasized that the government must prove a logical

---

**5.** We have recognized that right in various contexts. *See, e.g., United States v. Ward,* 989 F.2d 1015, 1019 (9th Cir.1993) (Fifth Amendment right to testify violated where court required defendant to take a standard form of oath rather than an oath of his own devising).

connection between the knowledge gained as a result of the commission of the prior act and the knowledge at issue in the charged act. *United States v. Hernandez–Miranda*, 601 F.2d 1104 (9th Cir.1979). Thus in *Hernandez–Miranda*, the court held that it was improper, where defendant was charged with smuggling drugs in a car, to admit evidence that on a previous occasion defendant had smuggled drugs in a backpack, since there was no "logical thread" connecting the prior act with the knowledge at issue in the act charged. *Id.* at 1108.

More recent cases, while frequently distinguishing *Hernandez–Miranda*, nevertheless take pains to point out the close similarities between the prior act and the act charged. *See United States v. Rubio–Villareal*, 927 F.2d 1495, 1503 (9th Cir.1992) (finding "striking" similarities where both the prior act and the crime charged were smuggling drugs concealed in a secret compartment), *vacated, en banc, on other grounds*, 967 F.2d 294 (9th Cir.1992); *United States v. Bibo–Rodriguez*, 922 F.2d at 1401–02 (same); *United States v. Sinn*, 622 F.2d 415, 416 (9th Cir.) (in both the prior and the charged act, "the identical drug was involved, and was found on the person of the appellant"), *cert. denied*, 449 U.S. 843, 101 S.Ct. 124, 66 L.Ed.2d 51 (1980); *but see Mehrmanesh*, 689 F.2d at 831–33 (stating only that "we noted in *Hernandez–Miranda* that the greater the similarity of the prior act to the present offense, the less tenuous the inference that may be drawn," and holding that evidence that defendant had once possessed smuggled narcotics was properly admitted to prove his knowledge of drugs in a suitcase sent from Iran). In the recent case of *Garcia–Orozco*, this court reiterated the need for a logical basis from which to infer the knowledge at issue in the later crime, and held that there was an insufficient connection, for Rule 404(b) purposes, between a previous conviction for resisting arrest—while fleeing from a car containing drugs—and the knowledge, in the context of the crime charged, that the car defendant was driving contained drugs. 997 F.2d at 1304.

Appellant's challenge to the admission of the prior bad acts evidence is based on the first and fourth prongs of the test stated in *Garcia–Orozco*. Those two prongs, in cases like this, are essentially one and the same: similarity "is necessary to indicate knowledge and intent," *Bibo–Rodriguez*, 922 F.2d at 1402, because it can furnish the link between knowledge gained in the prior act and the claimed ignorance of some fact in the offense charged.

■ Appellant argues first that the prior bad act testimony of the co-defendants was simply not relevant to any material point at issue in his trial. It was not relevant to show knowledge or intent, appellant contends, because those elements were not disputed: his defense was that he did not participate in the alleged conspiracy at all. In support of this ground-level attack on relevancy, appellant cites *United States v. Powell*, 587 F.2d 443, 448 (9th Cir.1978), in which it was stated that "when a defendant denies participation in the act or acts which constitute the crime, intent is not a material issue for applying 404(b)."

In response, the government contends that knowledge and intent were material issues in the case simply because the government had to prove them. The government is correct on this point. In *United States v. Hadley*, 918 F.2d 848, 852 (9th Cir.1990), *cert. granted*, — U.S. —, 112 S.Ct. 1261, 117 L.Ed.2d 491 (1992), *cert. dismissed*, — U.S. —, 113 S.Ct. 486, 121 L.Ed.2d 324 (1992), this court explained that the very sentence appellant has quoted from *Powell* was non-binding dictum; *Hadley* then went on to hold that because defendant's choice of defense "did not relieve the government of its burden of proof" on any issue, including intent, the choice of defense also "should not prevent the government from meeting this burden by an otherwise acceptable means [such as] Rule 404(b)." *Id.* Thus the fact that appellant's defense was non-participation does not render the issue of knowledge irrelevant.

Moreover, as the government points out, certain aspects of appellant's defense *do* put knowledge at issue, at least at a general level: the defense tried to show that appellant did not know there were drugs in the Otis Avenue and East 73rd Street apartments (the stash houses owned by his family), and that he knew nothing of the drug

deals which were being made by Ortiz on a day when appellant was observed engaged in vociferous conversation with him.

■ But while the relevance of knowledge can be established at this level of generality, the government still bears the burden of proving a logical connection between appellant's purported involvement in the previous drug deal and a material fact at issue in the crime with which he was charged.

Recognizing the need for proof of such a connection, defense counsel, in a pretrial hearing, pressed the government for details of the prior transaction—details which would enable the trial court to determine whether the link between knowledge gained and knowledge at issue could in fact be forged. The trial court, however, was satisfied with information of the crudest sort—the mere fact that appellant had allegedly made prior drug deals with the co-defendants. But without further inquiry, the trial court was simply unable to make the focused determination of relevance mandated by the authorities discussed above. It could *not* tell whether or not appellant's purported wrongdoing put him on notice of the facts about which he disclaimed knowledge in this case. For this reason, the procedures used by the district court were flawed.

■ The district court's failure to require more specific information was not the only deficiency in its procedures. This circuit has specifically incorporated Rule 403's probative value/unfair prejudice balancing requirement into the Rule 404(b) inquiry. *United States v. Brown*, 880 F.2d 1012, 1014 (9th Cir.1989), *United States v. Sarault*, 840 F.2d 1479, 1485 (9th Cir.1988). The Supreme Court, moreover, has emphasized the importance of a Rule 403 analysis in Rule 404(b) cases. *Huddleston v. United States*, 485 U.S. 681, 691, 108 S.Ct. 1496, 1502, 99 L.Ed.2d 771 (1988) (Rule 403, among others, provides necessary protection against unfairly prejudicial evidence which might otherwise be admitted under Rule 404(b)). Thus while the trial court was not required to provide a detailed or even a mechanical recitation of the Rule 403 factors, *United States v. Ono*, 918 F.2d 1462, 1465 (9th Cir.1990), it was required to apply Rule 403 at this stage. The court

appears to have misunderstood that obligation, stating that "I don't have to make a determination of [the] probative value [of the evidence]. I have to make a determination of its relevancy and it is probative on relevancy, the act which is being offered." Tr. at 16. In failing to undertake a proper Rule 403 analysis, the district court erred.

■ The confusion surrounding the district court's admission of the prior bad acts evidence, moreover, was compounded by the government's assertion that it was offering that evidence *both* to show knowledge and intent under Rule 404(b) *and* to prove an additional overt act within the conspiracy charged. On appeal, appellant has attacked the latter theory, and the government has abandoned it for understandable reasons: there was no evidence that the transaction with McElhannon, which allegedly occurred two months before the acts listed in the indictment, let alone the transaction with Smith and Harmon, which allegedly occurred a year and a half before, and with different players, stemmed from the same conspiratorial agreement as the acts charged.

The fact that the prior acts evidence was admitted under both a faulty overt act theory and a Rule 404(b) theory was clearly prejudicial to appellant. Because the disputed testimony was offered under the overt act theory as *direct* evidence of wrongdoing, appellant was unable to request the limiting instruction to which he would otherwise have been entitled—that is, an instruction that the testimony was to be considered only to prove knowledge or intent. In other words, the effect of the government's conflation of evidentiary theories was that the jury was allowed to use the Rule 404(b) evidence in precisely the way in which such evidence should never be used: to convict appellant of the uncharged acts themselves.

Because we remand this case on the basis of the trial court's withdrawal of the interpreter, discussed above, we need not decide whether, if the trial court had made the requisite inquiries under Rules 404(b) and 403, the prior acts evidence might still have been admissible. Nor do we decide whether or not the deprivation of the limiting instruc-

tion to which it now appears appellant was entitled constitutes harmless error. We leave the 404(b)/403 question for the district court to decide in the first instance on retrial, and we presume that, unless the government somehow revives its overt act theory, the jury will be given a limiting instruction if appellant asks for one.

Without foreordaining the result, we nevertheless feel constrained to offer several observations for the guidance of the trial court on remand. We point out first that the trial testimony of Smith, Harmon, and McElhannon hardly revealed the "striking similarity" between the prior acts and the charged acts the government claims. The only similarity seems to be that all of the acts involved drug deals in which Mayans appeared to be something more than a minor player. The differences are more obvious than the similarities—as are the implications of those differences for the logical connection the government must draw between the prior acts and the knowledge at issue in this case. In the Smith/Harmon transaction, Mayans attended a drug sale in person, and he himself delivered the cocaine he was selling.[6] It is far from obvious how the knowledge he gained from doing so would have put him on notice that Ortiz—who was not involved in the Smith/Harmon deal—was selling drugs on January 14, or that the properties owned by Mayans' family were being used as stash houses. In the McElhannon transaction, appellant was alleged to have acted in concert with Cristino Jacobo, a co-defendant in this case; we can see that this should have put him on notice that Jacobo was a drug dealer. Given Jacobo's *acquittal* in this case, however, it is unclear how this helps the government.

We also note that while the identity of the *buyers* in the prior and charged transactions may initially appear to be of some assistance to the government, the significance of this fact must be analyzed with some care. The participation of the same buyers in the two deals does not seem to bear on why appellant should have known that his apartments were

being used as stash pads, or that Ortiz was a drug dealer—the pertinent issues of knowledge in this case.

In short, on the record before us, we have serious doubts that the requisite link between knowledge gained and knowledge at issue was established. But because neither the district court nor the government properly focused on that link, we think it best to allow the district court, in the context of a new trial, and guided in the exercise of its discretion by the discussion above, to determine whether or not the prior acts evidence should be admitted.

### 3. *Cross-examination of the Buyers*

 The right to cross-examine adverse witnesses, stemming from the confrontation clause, is "especially important with respect to accomplices or other witnesses who may have substantial reason to cooperate with the government." *United States v. Onori*, 535 F.2d 938, 945 (5th Cir.1976). The details of a plea agreement are "highly relevant" in assessing the credibility of a co-defendant who has pled guilty, and inquiry into such details is "essential" for effective cross-examination. *United States v. Roan Eagle*, 867 F.2d 436, 443–44 (8th Cir.), *cert. denied*, 490 U.S. 1028, 109 S.Ct. 1764, 104 L.Ed.2d 199 (1989). Moreover, "this is especially true if th[e] witness has not yet been sentenced as there is a continuing incentive to give testimony that strengthens the prosecution's case." *Id.* at 443. Finally, "what tells ... is not the actual existence of a deal but the witness' belief or disbelief that such a deal exists." *Onori*, 535 F.2d at 945.

 The trial court obviously did not understand the importance of what the co-defendants believed. When the attorneys for the three defendants attempted to question the three co-defendant witnesses about their understanding of specific provisions of the plea agreements—written documents which were eventually entered into evidence—the court sustained several "best evidence" ob-

---

6. The dissimilarities between the earlier and the later acts also pose significant difficulties for the *"modus operandi"* theory put forward by the government on appeal. If a distinctive modus

operandi can be discerned in acts this dissimilar, then it would appear that practically every high-level drug dealer in the greater Los Angeles area has the identical *modus operandi*.

jections made by the government. The "best evidence" rule, Fed.R.Evid. 1002, provides that when the contents of a writing are at issue, the original writing is required—and implicitly, that extrinsic evidence may be disallowed. In sustaining objections based on this rule, the district court appears to have concluded that testimony about the witnesses' understanding of what the written plea agreements meant added nothing to the documents themselves. This conclusion was made explicit when the trial court stated to counsel for defendant Jacobo, who was attempting to elicit McElhannon's understanding of his plea agreement, that "[the witness'] understanding of the document is totally irrelevant." Tr. at 641–42. But the understanding of all three of the witnesses clearly *was* relevant, and the district court erred by cutting off defense counsel's cross-examination on the grounds that it was not.

The government argues that the challenged rulings went to only a handful of the questions the three defense attorneys asked in their effort to impeach the witnesses' credibility by reference to the plea agreements. The government points out that the witnesses were able to answer the bulk of these questions without objection. We are inclined to agree that the trial court's error may well have been harmless in light of the extensive cross-examination which was allowed on this matter. Since we remand on other grounds, however, we need not decide this question.

### 4. *Prosecutorial Comments*

■■■ In *Griffin v. California*, 380 U.S. 609, 615, 85 S.Ct. 1229, 1233, 14 L.Ed.2d 106 (1965), the Supreme Court held that the Fifth Amendment forbids prosecutorial comment on a defendant's decision not to testify. A prosecutorial statement "is impermissible if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir.1987). We review *Griffin* claims *de novo*. *United States v. Gray*, 876 F.2d 1411, 1416 (9th Cir.1989), *cert. denied*, 495 U.S. 930, 110 S.Ct. 2168, 109 L.Ed.2d 497 (1990). Nevertheless, reversal is warranted only where it appears that the comment may possibly have affected the verdict. *Id.* Where defense counsel remains silent in the face of the arguably impermissible comment, thereby waiving his objection, the standard of review on appeal is higher, and reversal is warranted only if the trial court's failure to check the comment constituted plain error. *United States v. Sehnal*, 930 F.2d 1420, 1425–26 (9th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 300, 116 L.Ed.2d 244 (1991). The latter standard is appropriate here.

■■■ While a prosecutor may not draw attention to a defendant's silence, prosecutors are entitled to call attention to the defendant's failure to present exculpatory evidence more generally. *United States v. Lopez*, 803 F.2d 969, 973 (9th Cir.1986), *cert. denied*, 481 U.S. 1030, 107 S.Ct. 1958, 95 L.Ed.2d 530 (1987). Thus courts have maintained a distinction between comments about the lack of explanation provided by the *defense*, and comments about the lack of explanation furnished by the *defendant*. *Sehnal*, 930 F.2d at 1425 (listing authorities). Appellant contends that the prosecutor's comment was of such a character that the jury would understand it as a statement about his failure to testify—a failure attributed to *him*, rather than to the defense in general.

This argument lacks merit. Appellant asserts that the jury would have inferred that the prosecutor's remarks were directed at him because he was the only person who *could* have had any information about the event in question—the conversation with Ortiz, which only he and Ortiz could hear. While this logic is sound as a general matter, and has been adopted in several cases from this Circuit, *Sehnal*, 930 F.2d at 1425, *Lincoln v. Sunn*, 807 F.2d at 810, the prosecutorial comments in those cases contained very clear signals that the defendant himself, rather than the defense generally, was being discussed. Thus the prosecutor in *Sunn* made multiple references to the "only ... person who can tell us," and the "only ... other person who can testify," 807 F.2d at 809, n. 1, while the prosecutor in *Sehnal* employed the rhetorical tag "ask him" ("ask him if it's true," "ask him why it was," etc.).

930 F.2d at 1424. In this case, by contrast, there is nothing to single out the defendant from his case in general: the prosecutor stated only that "there is no evidence." Given the very general nature of this comment, the trial court did not commit clear error by failing, *sua sponte*, to conclude that the remark would naturally be construed by the jury as a comment on appellant's silence.

### 5. *Relevancy Rulings*

 Without deciding whether or not the district court's relevancy rulings were erroneous, we state simply that on remand, if the district court allows the government to introduce evidence of travel time between the Otis apartment and appellant's office, it must also allow appellant to introduce relevant evidence on this point. Evidence would not be irrelevant simply because it pertained to travel time between points *near* the locations in question rather than between those locations themselves.

Likewise, if the district court allows the government to introduce evidence about the Mayans family's wealth, the defense must be accorded the same treatment.

**REVERSED AND REMANDED.**