**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

MICHAEL DEMIRDJIAN,
*Petitioner-Appellant*,

v.

CONNIE GIPSON, Warden,
*Respondent-Appellee.*

No. 09-56453

D.C. No.
2:04-cv-08245-GHK-JTL

OPINION

Appeal from the United States District Court
for the Central District of California
George H. King, Chief District Judge, Presiding

Argued and Submitted May 12, 2014
Pasadena, California

Filed August 10, 2016

Before: John T. Noonan, Jr., Kim McLane Wardlaw
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher;
Dissent by Judge Noonan

# SUMMARY[*]

## Habeas Corpus

The panel affirmed the district court's judgment dismissing California state prisoner Michael Demirdjian's habeas corpus petition challenging his conviction and sentence for murdering two teenage boys with intent to inflict torture, committed when Demirdjian was 15 years old.

Demirdjian claimed that his counsel was ineffective by failing to challenge statements by the prosecutor as either improper comments on Demirdjian's decision not to testify, in violation of *Griffin v. California*, 380 U.S. 609 (1965), or improper shifting of the burden of proof to the defense. Under the deferential standard required by AEDPA, the panel concluded that there is a reasonable argument that, because there was no prosecutorial error, defense counsel's decision to rebut the prosecution's comments directly rather than object at trial or on appeal was adequate, and that this strategy did not undermine the reliability of Demirdjian's conviction.

Demirdjian also claimed that his sentence of two consecutive terms of 25 years to life violates the Eighth Amendment under *Miller v. Alabama*, 132 S. Ct. 2455 (2012), because it is the "functional equivalent" of a mandatory life-without-parole sentence and he was a juvenile offender. Applying the deferential AEDPA standard, the panel held that there is a reasonable argument that the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

sentence is constitutional because it actually allows for the possibility of parole.

Dissenting, Judge Noonan wrote that trial counsel's performance was constitutionally deficient because he failed to object to the prosecution's improper attempts at burden shifting, multiple *Griffin* errors, and pleas to the jurors' passions; that this deficient performance influenced the jury's verdict; and that no reasonable argument exists to the contrary.

## COUNSEL

Mark J. Geragos (argued), Geragos & Geragos, Los Angeles, California, for Petition-Appellant.

Jason Tran (argued), Deputy Attorney General; Kenneth C. Byrne, Supervising Deputy Attorney General; Lance E. Winters, Senior Assistant Attorney General; Dane R. Gillette, Chief Assistant Attorney General; Kamala D. Harris, Attorney General; Office of the Attorney General, Los Angeles, California; for Respondent-Appellee.

# OPINION

FISHER, Circuit Judge:

Michael Demirdjian appeals the denial of his 28 U.S.C. § 2254 habeas petition.  In 2001, he was convicted of murdering two teenage boys with intent to inflict torture; he was 15 years old at the time of the crimes.  During closing argument, the prosecution repeatedly commented on the defense's failure to explain key incriminating evidence or use competent evidence to support its exculpatory theories.  Instead of objecting, defense counsel rebutted the comments by giving non-incriminating explanations of the evidence and reminding the jury the prosecution bore the burden of proof.  Demirdjian was later sentenced to two consecutive terms of 25 years to life.

In his habeas petition, Demirdjian claims his counsel was ineffective by failing to challenge the prosecution's statements as either improper comments on Demirdjian's decision not to testify, in violation of *Griffin v. California*, 380 U.S. 609, 615 (1965), or improper shifting of the burden of proof to the defense.  He also claims his sentence violates the Eighth Amendment because it is the "functional equivalent" of a mandatory life-without-parole sentence, and he was a juvenile offender.  The district court denied habeas relief on both claims.

We affirm under the deferential standard required by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  Under AEDPA, the question is not whether we think Demirdjian received ineffective assistance or an unconstitutional sentence, but whether there is any reasonable argument to the contrary.  We conclude there is.  First, there

is a reasonable argument that, because there was no actual prosecutorial error, defense counsel's decision to rebut the prosecution's comments directly rather than object at trial or on appeal was adequate, and this strategy did not undermine the reliability of Demirdjian's conviction. Second, there is a reasonable argument Demirdjian's sentence is constitutional because it actually allows for the possibility of parole.

## I. Background

On the evening of Saturday, July 22, 2000, petitioner Michael Demirdjian, then 15, played basketball at a local park with 13-year-old Chris McCulloch and 14-year-old Blaine Talmo, Jr. Around 9:50 p.m., he left with the boys to go to a nearby school. The next evening, McCulloch and Talmo were found on a playground a few blocks away – dead from multiple blunt force trauma. Next to Talmo's battered head, officers found a 16-pound rock stained with both victims' blood. A 12-foot bench weighing more than 60 pounds lay across McCulloch's chest and neck. The right front pocket of Talmo's pants was pulled out, as if emptied. A trail of bloody shoe prints indicated someone had walked away from the scene to an outside sink stained with McCulloch's blood.

Police later found traces of McCulloch's blood on Demirdjian's doorjamb. In Demirdjian's trash were Talmo's alarm clock and wallet – with some of the contents burned – and a pair of recently cleaned, but still bloody, sneakers. The discarded sneakers matched the bloody shoe prints, two dogs identified Demirdjian's scent on the 16-pound rock, and drops of Demirdjian's blood were found at the crime scene. Demirdjian had fresh cuts on his hands and knuckles and had lied when asked by Talmo's stepmother if he had seen Talmo.

The state charged Demirdjian with two counts each of robbery and murder, with special circumstances for multiple murders, murder during a robbery and murder involving torture.

Demirdjian was tried twice. At his first trial, he took the stand and testified he had witnessed 19-year-old Adam Walker, a well-known drug dealer, murder the boys, but had not himself participated in the murders. That trial resulted in a hung jury, deadlocked at 8–4 in favor of conviction after a week of deliberations. At his second trial, Demirdjian did not testify. The prosecution focused on the key physical evidence tying Demirdjian to the crime scene and implying a guilty mind. As to motive, the prosecution theorized Demirdjian and his friend Damian Kim had wanted to "jack" McCulloch and steal his money because, five days earlier, Walker had pulled a "jack move" and stolen hundreds of dollars from Demirdjian and Kim during a fake drug deal. The defense challenged the reliability of some of the prosecution's key evidence, but focused primarily on introducing circumstantial evidence that Adam Walker murdered the boys and had his friends help clean up. Specifically, the defense emphasized that Walker had scrapes and bruises on his body, and police found at his friend's home a washed rug, a blood stain initially matching the stain on Demirdjian's door (but later found not to be a match) and – in the trash – some damp clothes, gloves and a newspaper article about the crimes.

The first prosecutor to speak at closing, Barshop, noted the prosecution's burden of proof, but repeatedly called on the defense to "explain" certain "unexplainable" evidence, such as the discarded wallet and clock, the bloody shoe prints and the blood stain at Demirdjian's home. Defense counsel, Mathews, responded with non-incriminating explanations of

the evidence and stressed that the prosecution bore the burden of proof. A second prosecutor, Do, spoke on rebuttal, discrediting the defense's explanations and theory about Walker as not based on "reliable, competent evidence." Defense counsel did not object to any of the prosecutors' statements. The court later instructed the jury that Demirdjian had a constitutional right not to testify, the jury could not discuss or draw any inferences from his silence and the prosecution bore the burden of proof.

The jury deliberated for five days and convicted Demirdjian of two counts of first-degree murder, with special circumstances for multiple murders and intentional infliction of torture. He was acquitted of robbery and special-circumstance murder during a robbery and was sentenced to two consecutive terms of life imprisonment without parole. On appeal, Demirdjian's counsel did not directly attack the prosecution's closing argument challenges to the defense on key evidence, but did argue the jury had impermissibly considered Demirdjian's silence.

After exhausting his direct appeals, Demirdjian timely filed a state habeas petition claiming, among other things, ineffective assistance based on his counsel's failure to challenge the prosecution's closing statements as either violating *Griffin* or improperly shifting the burden of proof to the defense. The trial court summarily denied the petition, as did the California Court of Appeal, stating the petition "ha[d] been read and considered." The California Supreme Court denied review.

While that petition was pending, the California Attorney General informed the trial court that Demirdjian's sentence likely violated California law because he was only 15 years

old at the time of the crimes. After a new sentencing hearing, Demirdjian was resentenced to two consecutive terms of 25 years to life, making him eligible for parole after 50 years. On appeal, he argued his new sentence violated the Eighth Amendment because he was a juvenile offender. The California Court of Appeal affirmed, reasoning that no Supreme Court precedent barred his sentence, *see People v. Demirdjian*, 50 Cal. Rptr. 3d 184, 187–88 (Ct. App. 2006), and the California Supreme Court again denied review.

Demirdjian timely filed a federal habeas petition. After the district court dismissed the petition, we granted a certificate of appealability on two issues: whether Demirdjian's counsel was ineffective at trial and on appeal by failing to raise a claim of prosecutorial misconduct for *Griffin* error and improper burden shifting; and whether Demirdjian's sentence of two consecutive terms of 25 years to life constitutes cruel and unusual punishment because he was a minor at the time of the crimes. We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we affirm.

## II.  Standard of Review

We review de novo a district court's denial of a habeas petition. *See Murray v. Schriro*, 745 F.3d 984, 996 (9th Cir. 2014). Our review is governed by AEDPA, which "bars relitigation of any claim 'adjudicated on the merits' in state court" unless the state court's decision satisfies 28 U.S.C. § 2254(d)(1) or (2). *Harrington v. Richter*, 562 U.S. 86, 98 (2011) (quoting 28 U.S.C. § 2254(d)). AEDPA's relitigation bar applies to both Demirdjian's summarily denied ineffective assistance claim, *see id.* at 99–100, and his Eighth Amendment claim, *see id.* at 98. The California Court of Appeal's decision on each claim is the "relevant state-court

decision" for purposes of § 2254(d).  *Murray*, 745 F.3d at 996.  Accordingly, for each of Demirdjian's claims, we cannot grant habeas relief unless the California Court of Appeal's decision on that claim was "contrary to, or involved an unreasonable application of" clearly established Supreme Court authority.  28 U.S.C. § 2254(d)(1).[1]

This standard is "difficult to meet."  *Richter*, 562 U.S. at 102.  We must "determine what arguments or theories supported or" – for Demirdjian's summarily denied ineffective assistance claim – "*could* have supported the state court's decision" and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Id.* (emphasis added).  We can grant habeas relief only where the state court's decision is "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."  *Id.* at 103.

It is "all the more difficult" to satisfy § 2254(d)(1) where, as here, the petitioner raises an ineffective assistance claim.  *Id.* at 105.  Even on de novo review, the standard for showing ineffective assistance is "highly deferential."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  When we evaluate an ineffective assistance claim under § 2254(d)(1), our review is "doubly deferential."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  If "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," we must deny habeas relief.  *Richter*, 562 U.S. at 105.

---

[1] Demirdjian's argument that § 2254(d) does not apply to his summarily denied ineffective assistance claim is precluded by *Richter*, 562 U.S. at 99–100.  Because he does not contend he is entitled to relief under § 2254(d)(2), we consider only § 2254(d)(1).

### III.  Ineffective Assistance Claim

*Strickland* provides the clearly established law governing Demirdjian's ineffective assistance claim.  *See Gentry v. Sinclair*, 705 F.3d 884, 899 (9th Cir. 2013) (evaluating an ineffective assistance claim under AEDPA using *Strickland*'s two-pronged test).  In *Strickland*, the Supreme Court made clear "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  466 U.S. at 686.  The Court then established a two-pronged test for meeting that standard: an individual must show "counsel's performance was deficient" and "the deficient performance prejudiced the defense."  *Id.* at 687.  "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  We hold there is a reasonable argument Demirdjian has failed to do so here.

### A.  Deficient Performance

We first consider whether the California Court of Appeal reasonably could have concluded defense counsel's performance was not deficient.  Under *Strickland*'s first prong, an attorney's representation is deficient if it "fell below an objective standard of reasonableness," as seen "from counsel's perspective at the time."  466 U.S. at 688, 689.  Because "it is all too easy" for courts to second guess errors in hindsight, *id.* at 689, *Strickland* mandates a "strong presumption" that counsel acted "for tactical reasons rather than through sheer neglect," *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam).  To overcome this strong presumption, Demirdjian must show counsel's errors were

"so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Demirdjian contends his counsel performed deficiently at trial and on appeal by failing to challenge some of the statements the prosecution made at closing. Before we can assess that performance, though, we must determine "whether the prosecutor's remarks constituted objectionable misconduct." *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015). In making that determination, we are mindful that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams v. Taylor*, 529 U.S. 362, 410 (2000). AEDPA thus prohibits us from treating a prosecutorial statement as error if "there is any reasonable argument" to the contrary. *Richter*, 562 U.S. at 105.[2] Because there is a reasonable argument *none* of the statements was error, we hold the California Court of Appeal reasonably could have concluded counsel's performance was not deficient.

---

[2] The parties dispute which law governs that inquiry. Demirdjian assumes we should apply our own precedents on *Griffin* and burden shifting, whereas the state argues only clearly established Supreme Court authority is relevant, *see Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("In cases where the Supreme Court has not adequately addressed a claim, this court cannot use its own precedent to find a state court ruling unreasonable."). We do not decide the issue because Demirdjian would not prevail on this prong even under our own precedents. Assuming our case law on *Griffin* and burden shifting applies, we ask whether Demirdjian has proven prosecutorial error "beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

### 1. Alleged *Griffin* Errors

Demirdjian has not shown the prosecution committed *Griffin* error beyond any possibility for fairminded disagreement. *Griffin* prohibits "comment by the prosecution on the accused's silence." 380 U.S. at 615. We have distinguished, however, between permissible "comments about the lack of explanation provided by the *defense*" and impermissible "comments about the lack of explanation furnished by the *defendant*." *United States v. Mayans*, 17 F.3d 1174, 1185 (9th Cir. 1994). A prosecutor's remark thus can "call attention to the defendant's failure to present exculpatory evidence," *id.*, so long as it is not "of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify," *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987).

The nearly two dozen *Griffin* errors alleged here fall into three main groups. The first group, by far the largest, consists of statements asking defense counsel Mathews to explain certain "unexplainable" evidence. These statements followed the same pattern. The first prosecutor, Barshop, highlighted a piece of incriminating evidence – the cuts on Demirdjian's hands, the bloody shoe prints that matched the blood-stained sneakers in Demirdjian's trash, the stain of McCulloch's blood on Demirdjian's doorjamb and the discarded wallet and clock – and offered the prosecution's explanation. Barshop then expressly asked defense counsel – not Demirdjian – to "explain" the evidence in a non-incriminating way.[3] Defense

---

[3] For example, after reasoning Demirdjian's cuts must have come from handling the 16-pound rock found at the crime scene, Barshop said:

counsel Mathews responded on rebuttal by offering non-incriminating explanations of this evidence. The second prosecutor, Do, then criticized the defense's explanations as not based on "reliable, competent evidence."[4]

---

*So I say to you, Mr. Mathews, explain it. What is the explanation for this other than mine? What is the evidence that is offered other than ours?* Where did these injuries on the Defendant's hands come from? . . .

. . . .

If you are in a fight or if you are delivering a blow, where are there injuries? To the knuckles. . . . *Is there any other explanation? Is there any other valid, viable explanation?* I think not. That's what the testimony is. . . .

. . . How big do you have to be to pick up a big ass rock? 16-pound rock. . . . It's where you cut your hands. How big do you have to be to hit somebody in the face? You cut your knuckle. *You cannot explain the unexplainable. It's not possible.*

(Emphasis added.)

[4] Do said about Demirdjian's cuts, for example:

[Demirdjian's] hands were cut and bruised. *How does Mr. Mathews explain that?*

Mr. Barshop asked, "explain it with competent, reliable, admissible evidence." How does Mr. Mathews explain it? Well, Michael Demirdjian was playing basketball. You know how kids are. They get cuts.

. . . But you're not getting cut and bleeding at a crime scene where there are two victims of a double

There is a reasonable argument none of these remarks violated *Griffin*. No statement directly "comment[ed] . . . on [Demirjian]'s silence." *Griffin*, 380 U.S. at 615. And we have upheld similar comments as merely calling attention to the defense's failure to explain incriminating evidence or introduce exculpatory evidence. *See, e.g.*, *Mayans*, 17 F.3d at 1179, 1186 ("[T]here is no evidence to contradict [the incriminatory nature of the defendant's interaction]."); *United States v. Sehnal*, 930 F.2d 1420, 1423, 1425 (9th Cir. 1991) ("[A]sk [defense counsel] if he's explaining to you why it is that none of these monies found their way into the corporate bank account."); *United States v. Wasserteil*, 641 F.2d 704, 709 (9th Cir. 1981) ("I asked all the defendants . . . to please explain to you how this legitimate business transaction worked . . . . Did you hear an explanation from them?").

The dissent argues these statements were nevertheless *Griffin* error because Demirdjian was the "sole person who could provide information" on the prosecution's questions. *Rhoades v. Henry*, 598 F.3d 495, 510 (9th Cir. 2010). As defense counsel's rebuttal arguments demonstrated, however, Demirdjian was not necessarily the *only* source of explanation available to the defense.[5] Regardless, such comments are

---

homicide. *That's not a good explanation; not based on reliable, competent evidence.*

(Emphasis added.)

[5] On rebuttal, Mathews countered the prosecution's evidence in the absence of Demirdjian's testimony. As Mathews explained, the shoe prints merely confirmed what the jury already knew: that Demirdjian was at the crime scene. There was not "even one syllable of medical or scientific evidence" that Demirdjian's cuts came from handling a rock, he added, and they were too healed to have come from the time of the

impermissible only where there are "very clear signals that the defendant himself, rather than the defense generally, was being discussed." *Mayans*, 17 F.3d at 1185; *see Sehnal*, 930 F.2d at 1424 (prosecutor improperly used the rhetorical tag "ask him" to refer to the defendant); *Lincoln*, 807 F.2d at 809 & n.1 (prosecutor improperly said the defendant was the "only . . . person who can tell us"); *United States v. Sigal*, 572 F.2d 1320, 1322–23 & n.1 (9th Cir. 1978) (prosecutor improperly said "the defendants did not deny" heading up part of the conspiracy). Here, the prosecutors' focus on the *defense's* failure to introduce "competent, admissible evidence" arguably was not a very clear signal that *Demirdjian* was being discussed. *See, e.g.*, *Rhoades*, 598 F.3d at 511 (holding that the statement, "If there was evidence out there that would disassociate this gun from [the defendant], we'd have heard it," was not *Griffin* error because a "natural reading" was "there was no meaningful challenge to the government's evidence").

The second group of statements came from Do's rebuttal closing, where she commented on evidence indicating Demirdjian had a guilty mind. Do asked counsel to explain why the contents of Talmo's wallet were burned and why Demirdjian had lied to Talmo's stepmother about whether he had seen Talmo:

---

murders. Defense counsel further reasoned the blood stain on Demirdjian's doorjamb must have been planted by the police because McCulloch's blood was not found anywhere else in Demirdjian's home and the prosecution had previously "influence[d] the evidence." And he argued the wallet and clock could not have been taken from Talmo's body because there were no fingerprints or blood on them.

What Mr. Mathews has given is alternative facts. . . .

*How does he explain* the fact that the contents [of Talmo's wallet] are burned, and ripped-out, and thrown out with his bloody shoes? He hasn't. . . . *Has he given you any explanation for why Michael Demirdjian is destroying evidence? Any explanation* for why Michael Demirdjian is concealing evidence?

. . . .

Now, *Mr. Mathews wants you to believe that there's no way Michael Demirdjian would harm these two boys because they're his friends.* Just think about it. . . . [Demirdjian] looks at [Talmo's stepmother] and he tells her, "I don't know where they are. I haven't seen them. I'm expecting a phone call."

*How do you explain that?* He certainly was not Chris McCulloch and Blaine Talmo's friends [sic].

(Emphasis added.) Although on de novo review this would be a closer case, there is at least a reasonable argument these statements merely commented on the defense's "failure to present exculpatory evidence." *Mayans*, 17 F.3d at 1185.

Again, none directly "comment[ed] . . . on the accused's silence." *Griffin*, 380 U.S. at 615. The first statement, which

Do expressly addressed to defense counsel, arguably did not contain "very clear signals" she was referring to Demirdjian in particular. *Mayans*, 17 F.3d at 1185. At one point, Do used the pronoun "he" to refer to both Mathews and Demirdjian, but the referents are clear enough from context that the comment need not have "naturally *and necessarily*" called for an explanation from Demirdjian himself. *Lincoln*, 807 F.2d at 809 (emphasis added). For the other two statements, Do was not necessarily asking the jury to "treat the defendant's silence as substantive evidence of guilt," *United States v. Robinson*, 485 U.S. 25, 32 (1988) (quoting *Baxter v. Palmigiano*, 425 U.S. 308, 319 (1976)), but could have been permissibly using his earlier lies to discredit the theory that he was friends with the victims.[6]

In the final group of statements, Do directly addressed the defense's theory that Adam Walker was the murderer. At trial, defense counsel had presented only circumstantial evidence to show Walker was the murderer. During closing, however, Mathews suggested one of Walker's friends, Greg Furnish, had seen Walker at the crime scene: "There was one witness to the murders," Mathews told the jury, "and it was not Michael Demirdjian."[7] Mathews also twice suggested

---

[6] Demirdjian points to Barshop's invitation to determine "[w]hat's going on in Michael Demirdjian's mind," given that his computer had material on "[k]illing somebody with a big ass rock." There is a reasonable argument this invitation, too, did not comment on Demirdjian's silence, but merely pointed out that the jury needed to determine Demirdjian's mental state.

[7] Defense counsel never elicited this testimony from Furnish, who was a witness for the prosecution. On cross-examination, Furnish testified that Walker had been partying with him all night on the night of the murders, and that "Adam Walker had nothing to do with this murder."

Demirdjian "saw Adam Walker" at the crime scene – the second time over the prosecution's objection. Though recognizing defense counsel's remarks were "error," the trial court ruled that, to avoid any *Griffin* error in response, the prosecution could not "comment" on what Demirdjian saw, but was "free to comment on" how the defense's theory lay "outside any evidence that has been received in this trial." On rebuttal, Prosecutor Do told the jury, "You've heard no testimony, no evidence from this witness stand, that puts Adam Walker at that crime scene." And a few times she called the defense's theory "smoke and mirrors" or "a bunch of smoke screens to hide Michael Demirdjian."

Do's first statement was troublesome, but arguably permissible in context. Consistent with the trial court's ruling, Do ostensibly highlighted the problems with the defense's circumstantial evidence before concluding there was "no testimony, no evidence" actually placing Walker at the crime scene. Because she never singled out Demirdjian as a possible witness – and there was another possible witness in Furnish – her remarks arguably constituted "legitimate comment . . . on the weaknesses in the defense case." *Robinson*, 485 U.S. at 32 (internal quotation marks omitted); *see Mayans*, 17 F.3d at 1179, 1186 (upholding statement that "there is no evidence to contradict [the prosecution's theory]" given "there [wa]s nothing to single out the defendant from his case in general"). Do's "smoke and mirrors" comments, too, arguably were "directed to 'the strength of the defense on the merits'" and thus were not an impermissible "*ad hominem* attack on defense counsel." *United States v. Ruiz*, 710 F.3d 1077, 1086 (9th Cir. 2013) (quoting *United States v. Nobari*, 574 F.3d 1065, 1079 (9th Cir. 2009)). As Do explained, she was highlighting "each and every area Mr. Mathews has raised that I believe are smoke and mirrors to trick you into

believing there's something there that really isn't." *See United States v. Del Toro-Barboza*, 673 F.3d 1136, 1150–51 (9th Cir. 2012) (noting that similar remarks in another case only "may have crossed the line").[8]

The dissent assumes the prosecution's remarks, taken together, necessarily commented on Demirdjian's silence. Dissent at 40–41. We agree the prosecution's statements were aggressive, and some were close enough to crossing the line that, on de novo review, they would present a closer case. But "AEDPA demands more." *Richter*, 562 U.S. at 102. No statement directly called attention to Demirdjian's failure to testify; and each statement, whether in isolation or in conjunction with others, reasonably could be understood as calling attention to the *defense's* failure to present exculpatory evidence. Because we cannot say any statement violated *Griffin* "beyond any possibility for fairminded disagreement," *id.* at 103, the California Court of Appeal reasonably could have concluded there were no *Griffin* errors.

### 2. Alleged Burden Shifting

Demirdjian has not shown the prosecution clearly shifted the burden of proof to the defense. Barshop began his argument by emphasizing the jury must "decide the case based on the facts that you analyze," and characterizing counsel's presentation of the defense as "attack[ing]"

---

[8] Demirdjian further argues the prosecution's remarks violated *Griffin* because two jurors later said they "should have heard from Michael Demirdjian." But the jurors' comments arguably indicated only that the jury might have interpreted the remarks in a way that would constitute *Griffin* error, not that it "naturally and necessarily" did so. *Rhoades*, 598 F.3d at 510.

Talmo's stepmother, "infer[ring]" the facts were "compromised" because Talmo's father was a deputy sheriff and claiming Demirdjian's race was the "reason" for the first-degree murder charge. "In the bottom of the line," he said:

> [I]t is always easier to attack a case than to defend it. *And it is clear that the People have the burden of proof, and that will be an instruction that you receive.*
>
> But *attack the case with real evidence, with competent evidence*, not meanness, not nastiness.

(Emphasis added.) Asserting that "the evidence supports a theory that clearly the defendant is a perpetrator," Barshop then asked defense counsel, "What is the evidence that is offered other than ours?" with respect to Demirdjian's cuts, and invited counsel to explain the blood on the doorjamb "[b]y competent, admissible evidence. . . . Not by way of hypothesis, not by way of attorney spin, but by evidence admissible in a court of law." Do echoed Barshop's argument during rebuttal, saying, "The evidence is what comes off this witness stand, not what from the attorneys say or spin." She also twice quoted Barshop's refrain in rebutting counsel's explanations of the blood stains and Demirdjian's cuts, each time arguing Mathews had not explained the evidence with "competent, reliable, admissible evidence."

Demirdjian contends these statements impermissibly implied he had a duty or burden to produce evidence. But we rejected a similar burden-shifting claim under a plain-error standard in *United States v. Vaandering*, 50 F.3d 696 (9th Cir. 1995), where the prosecution repeatedly told the jury there

was "no evidence" the defendant, who had been charged with distributing methamphetamine, had ever had a job aside from drug dealing. *Id.* at 701–02 (citing *United States v. Mares*, 940 F.2d 455, 461 (9th Cir. 1991)). We reasoned such "comment on [the defendant's] failure to present exculpatory evidence" was permissible because it did not "expressly or implicitly shift[] the burden of proof," and the prosecutor "expressly told the jury the burden of proof was on the government." *Id.* at 702.

Here, too, Barshop told the jury the prosecution "clear[ly] . . . ha[s] the burden of proof"; no statement expressly shifted that burden, and arguably none implicitly shifted that burden either. The jury reasonably could have inferred that – in context – each repetition of Barshop's refrain was intended, like his original statement, merely as comment on the defense's trial tactics and weaknesses in the defense's theory of the case. *Cf. United States v. Tucker*, 641 F.3d 1110, 1122 (9th Cir. 2011) ("While the prosecutor's phrasing was inartful, his meaning is evident from context: to believe the defendant's account, the jury would have to believe implausible aspects of his testimony. This sort of argumentation is permissible."). We agree with Demirdjian that it is problematic the prosecution referred to its burden only once. But we acknowledge, as we must under AEDPA, that a fairminded jurist nevertheless could conclude the repetition of "competent, reliable, admissible evidence" merely highlighted that the defense had challenged the prosecution's case with innuendo and accusation, not exculpatory evidence.

The dissent contends the prosecutors' statements "impermissibly crossed the line" by arguing the defense had failed to counter the *prosecution's* theory. Dissent at 40.

That distinction made no difference in *Vaandering*, however, where we upheld the prosecution's statement that "[t]here is no evidence . . . [the defendant] ever had a job other than dealing drugs." 50 F.3d at 701. Even the dissent's sole authority on this point held that "brief comments . . . noting the absence of evidence contradicting what was produced by the prosecution on several points . . . . did [not] impermissibly shift the burden of proof to defendant." *People v. Bradford*, 939 P.2d 259, 322–23 (Cal. 1997); *see also People v. Woods*, 53 Cal. Rptr. 3d 7, 11 (Ct. App. 2006) ("Comments on the . . . defense's failure to call logical witnesses, introduce material evidence, *or rebut the People's case* are generally permissible." (emphasis added)). The California Court of Appeal reasonably could have concluded there was no burden-shifting.

### 3.  Alleged Appeals to the Jury's Passions

The dissent asserts defense counsel performed deficiently by failing to object to the prosecution's various "appeals to jurors' emotions" during closing. Dissent at 41–42. We do not reach these additional statements because they are not properly before us. Demirdjian mentions only the prosecution's reference to "[t]errorism against the state" – and even then only as evidence of prejudice, not deficient performance. Demirdjian failed to raise the remaining statements before the California Supreme Court and the district court, and does not dispute that those statements are therefore forfeited, *see Miles v. Ryan*, 713 F.3d 477, 494 n.19 (9th Cir. 2013), and unexhausted, *see* 28 U.S.C. § 2254(b) (requiring habeas petitioners to exhaust their claims in state court); *Gentry v. Sinclair*, 705 F.3d 884, 901 (9th Cir. 2013) ("Exhaustion requires a statement of the 'operative facts' that support the federal legal theory giving rise to the claim.").

### 4.  Counsel's Performance at Trial and on Appeal

Defense counsel Mathews did not object to any of the statements we have been discussing.  In assessing his performance, we begin with the "strong presumption" that he did not object "for tactical reasons."  *Yarborough*, 540 U.S. at 8.  Although Demirdjian has not provided a declaration from Mathews to show his actual reasons for not objecting, the record suggests Mathews made a strategic decision not to object and instead to address the prosecution's comments through his rebuttal.  During rebuttal, counsel repeatedly said Barshop had "invited me" or "challenged me" – not the defendant – to explain the evidence.  He then gave an exculpatory explanation for each "unexplainable" fact, and stressed – three times – that the prosecution bore the burden of proof.  To demonstrate the prosecution had failed to meet its burden, Mathews criticized the prosecution's failure to offer a coherent motive, catalogued how the investigation had been "botched" and challenged the prosecution to "explain" evidence that he said "proves conclusively that Adam Walker did this crime."  And he reminded the jury that it would be instructed to disregard the prosecution's "opening appeals to passion, prejudice, and sympathy."

The California Court of Appeal thus reasonably could have presumed that counsel made a strategic decision to address the prosecution's comments directly instead of objecting.  We cannot say that such a strategic decision would have been objectively unreasonable beyond any possibility for fairminded disagreement.  We have repeatedly held that, "absent egregious misstatements," failing to object to error during closing argument falls within the "'wide range'" of reasonable assistance. *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013) (quoting *United States v. Necoechea*,

986 F.2d 1273, 1281 (9th Cir. 1993)); *see also Zapata v. Vasquez*, 788 F.3d 1106, 1116 (9th Cir. 2015) (holding that "patent, inflammatory and repeated misconduct" was "egregious"). Arguably none of the statements here was error – let alone egregious error. In these circumstances, the state court could have concluded Mathews reasonably thought any objection would be "meritless," *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005), or decided not to object "to avoid highlighting [the statements]," *Cunningham*, 704 F.3d at 1159. Because Mathews directly responded to the prosecution's comments, and those comments arguably were not "patent, inflammatory and repeated," the state court was not required to conclude he performed deficiently by failing to object. *Zapata*, 788 F.3d at 1116.

The dissent disagrees based on its assumption that the prosecution's statements were, in fact, "egregious," Dissent at 42–44, but the California Court of Appeal was not required to make that assumption. To be sure, Mathews could have developed a record for appeal or tried to curtail the prosecution's repetition by objecting to some of the statements. But he also "could have legitimately thought that an objection would have served only to draw further attention to the damaging statement while clearly not erasing its effect from the jurors' minds." *United States v. Eaglin*, 571 F.2d 1069, 1087 (9th Cir. 1977). *Strickland* simply does not allow us to "second-guess" Mathews' decision with the benefit of hindsight. 466 U.S. at 689. Under AEDPA, we must "afford 'both the state court and the defense attorney the benefit of the doubt.'" *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016) (per curiam) (quoting *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013)).

As to the competence of Mathews on appeal, because a fairminded jurist could conclude counsel was not deficient at trial, she "could certainly conclude that the [state] court was not objectively unreasonable in deciding that appellate counsel was not incompetent." *Id.* at 1153; *see Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir. 2002) ("A failure to raise untenable issues on appeal does not fall below the *Strickland* standard."). Mathews focused the appeal on challenging what he argued was the "only link" allowing the jury to find Demirdjian had participated in the murders: the dog scent identifications. Counsel also raised five other claims of prosecutorial misconduct, including one for implying during closing argument that Demirdjian was a "terrorist against the government." Although counsel did not separately challenge the prosecution's statements on the "unexplainable" evidence, he addressed them indirectly through a jury misconduct claim alleging the jury impermissibly considered Demirdjian's silence during its deliberations. There is a reasonable argument Mathews' failure to raise *additional* claims in this context was not "so serious" an error that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Defense counsel no doubt could have done more to address the prosecution's aggressive line of argument, or made a better record by objecting to some of the statements. But, given that the prosecution's argument did not unquestionably cross the line, Demirdjian's present claim entails precisely the kind of "second-guess[ing]" of counsel's strategy that *Strickland* prohibits. 466 U.S. at 689. We therefore hold the California Court of Appeal reasonably could have concluded defense counsel's failure to object fell within *Strickland*'s "wide range" of reasonable assistance. *Id.*

### B. Prejudice

Even if Demirdjian's counsel had performed deficiently, he would not be entitled to habeas relief if the California Court of Appeal reasonably could have concluded he failed to establish prejudice. Under *Strickland*'s second prong, an individual must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* That requires a "substantial, not just conceivable" likelihood of a different result. *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). Demirdjian argues there was a substantial likelihood of a different result because the evidence against him was weak, two jurors were actually prejudiced and the prosecution stressed an inference of guilt from his silence. We hold the California Court of Appeal reasonably could have concluded otherwise.

Demirdjian first argues the evidence against him was weak and thus indicative of prejudice. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."). Although we agree the evidence of motive was weak, that arguably could not have affected the verdict. The jury was instructed that the prosecution need not prove motive and that the jury could – but need not – consider a lack of motive as a "circumstance" that might "tend to show" Demirdjian was not guilty. Moreover, Talmo's wallet and clock were in Demirdjian's trash, as were the burnt contents of the wallet and a pair of recently cleaned, blood-stained sneakers. No evidence negated this probative evidence of a guilty mind.

Defense counsel also acknowledged Demirdjian had been at the crime scene, and there was significant physical evidence that reliably tied him to the murders. Drops of his blood were next to the shoe prints leading away from the victims' bodies; his sneakers matched the shoe prints; and two different dogs identified his scent on the 16-pound rock. Demirdjian does not contest the reliability of the drops of blood and shoe prints, and there is a reasonable argument his challenges to the scent identifications did not undermine that evidence either.[9]

Accordingly, a fairminded jurist could conclude the evidence convincingly established (a) Demirdjian was at the crime scene, (b) handled the 16-pound rock, then (c) walked away bleeding and (d) went to a sink before returning home, where he (e) cleaned then discarded his sneakers and (f) discarded and burned some of Talmo's property. Although the defense offered non-incriminating explanations of some of this evidence, those explanations were arguably

---

[9] Demirdjian faults the first scent identification because, on her first attempt, the dog went past his home and lost the trail. But on that same attempt, the dog had reliably tracked the scent from the rock to Demirdjian's own shoe prints, then to the sink and onto the road where Demirdjian lived. As the dog handler explained, the dog may have gone past Demirdjian's home merely because she had picked up another trail he had left. Demirdjian "discredit[s]" the second identification because the second dog also identified the scents of two other individuals whom the defense asserted were in Palm Springs at the time of the crimes. But the prosecution used cell phone records and an eyewitness identification to place both individuals at the crime scene. A fairminded jurist thus could conclude neither scent identification was unreliable.

implausible.[10]  It therefore would have been reasonable to conclude Demirdjian did not establish prejudice based on the evidence against him. *See Richter*, 562 U.S. at 112 ("[i]t was also reasonable to find Richter had not established prejudice given that he offered no evidence directly challenging other conclusions reached by the prosecution's experts" that supported only the prosecution's theory of the crime scene).

Demirdjian next argues there was actual prejudice because one juror told a reporter, "I thought we should have heard from Michael Demirdjian," and another reportedly was "persuaded to change her vote from not guilty to guilty . . . because of [Demirdjian's] failure to testify."  But there is no evidence the jury ever discussed Demirdjian's silence; on the contrary, the first juror explained the "big factors" that weighed most heavily in the jury's decision were the shoe prints and Demirdjian's blood at the crime scene – not his silence.  There were arguably other indications that the jury did not struggle to determine his guilt.  On the fourth day of deliberations, the jury asked the court if Demirdjian could be guilty of special-circumstance murder as an aider and abettor, or if he had to be the "actual perpetrator."  Mere hours after the court answered that he could be convicted as an aider and abettor, the jury convicted him.  Based on the timing and substance of this colloquoy, a fairminded jurist could

---

[10] For example, defense counsel argued Demirdjian's shoe prints were at the scene because "[i]f you had seen what Michael Demirdjian saw in your stupor, you'd get out of dodge too."  That explanation, however, arguably was inconsistent with the actual shoe prints, which indicated Demirdjian had *walked* away from the crime scene.  Counsel now argues Demirdjian "checked to see if [Talmo] and [McCulloch] were alive."  But that argument, too, does not explain why he simply walked away after purportedly seeing his friends brutally murdered.

conclude the key question for the jury was not whether but *how* Demirdjian had participated in the murders.[11]

Regardless, there is a reasonable argument the jury instructions mitigated any prejudice. The jury was informed of the prosecution's burden four times – once by the prosecution, and three times by the defense. The court likewise instructed the jury the prosecution had "the burden of proving [Demirdjian] guilty beyond a reasonable doubt," and the jury was not to discuss or "draw any inference from the fact that [he] d[id] not testify." Because "[j]urors are presumed to follow the court's instructions," it would have been "reasonable for the state court to conclude that the prosecutor's remarks . . . were not prejudicial." *Cheney v. Washington*, 614 F.3d 987, 997 (9th Cir. 2010); *see Cunningham*, 704 F.3d at 1159 (holding there was no prejudice where the "comments were a single paragraph of a twenty-page argument and the trial judge explained to the jury that closing arguments are not evidence").

Demirdjian finally argues there was prejudice because the prosecution stressed an inference of guilt from his silence. But this rationale turns on whether any statement was itself error. As we have seen, it would have been reasonable to conclude that there were no errors and that the prosecution

---

[11] We generally treat the "difficult time the jury had reaching a unanimous verdict" as an "indicator of prejudice," *Stankewitz v. Wong*, 698 F.3d 1163, 1175 (9th Cir. 2012). We do not accord this factor great weight here, though, because there is a reasonable argument the jury's conduct was "not an unambiguous sign it was a close case." *Walker v. Martel*, 709 F.3d 925, 943 (9th Cir. 2013). Based on the timing of the questions and the quick turn-around after the response, the jury could have been exercising "diligence and care" in deciding Demirdjian's role in the murders. *Id.*

never actually asked the jury to infer guilt from Demirdjian's silence. *See Beardslee v. Woodford*, 358 F.3d 560, 587 (9th Cir. 2004) (holding that "clearly not extensive" *Griffin* errors were not prejudicial under an analogous standard where the prosecution implied, but did not stress, that the defendant's silence meant a lack of remorse).

The "ultimate focus" of the *Strickland* inquiry is on whether "the result of the particular proceeding is unreliable because of a breakdown in the adversarial process." 466 U.S. at 696. Although aspects of Demirdjian's trial give us pause, we cannot say all fairminded jurists would find the result unreliable. Given both the strength of the incriminating evidence and the jury instructions, we hold the California Court of Appeal reasonably could have concluded there was no prejudice from counsel's failure to object to the prosecution's statements.

## IV.  Eighth Amendment Claim

Demirdjian contends his sentence of two consecutive terms of 25 years to life violates the Eighth Amendment because he was a juvenile at the time of his crimes. This claim relies solely on the retroactive application of *Miller v. Alabama*, 132 S. Ct. 2455 (2012), which held "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders" violates the Eighth Amendment. *Id.* at 2469. Demirdjian argues he is entitled to habeas relief because his sentence is the "functional equivalent" of the mandatory life-without-parole sentences overturned in *Miller*. We disagree. Although it is now established that *Miller* applies retroactively, *see Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016), Demirdjian still must show *Miller*'s legal principles were "clearly

established" at the time of the California Court of Appeal's decision (six years before *Miller*) and this decision was "contrary to" *Miller* for purposes of § 2254(d)(1).**12** Demirdjian has not attempted to satisfy the first requirement; and we hold he has not satisfied the second.

*Miller*'s prohibition of mandatory life-without-parole sentences for juvenile offenders rested in part on the premise that "a distinctive set of legal rules" applies to a life-without-parole term for juveniles. 132 S. Ct. at 2466. Because such a term is the "ultimate penalty for juveniles . . . akin to the death penalty," *id.*, it "demand[s] individualized sentencing," including consideration of the juvenile's age and the circumstances of the crime, *id.* at 2467. *Miller* noted, however, that "no other sentences" "share [these] characteristics with death sentences." *Id.* at 2466 (quoting *Graham v. Florida*, 560 U.S. 48, 69 (2010)). There is a reasonable argument that *Miller* thus applies only to life-without-parole sentences.

Demirdjian concedes he has not received a life-without-parole sentence, but contends *Miller* nevertheless applies because his sentence is the "functional equivalent" of life without parole. The Supreme Court, however, has held an

---

**12** *Teague v. Lane*, 489 U.S. 288, 306–10 (1989), generally bars retroactive application of new constitutional rules of criminal procedure on collateral review. *Teague*'s retroactivity rule, however, is "quite separate from the relitigation bar imposed by AEDPA." *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011). Even if applying a rule retroactively "would comport with *Teague*," we still must ask whether "doing so would contravene section 2254(d)(1)," *Meras v. Sisto*, 676 F.3d 1184, 1188 (9th Cir. 2012), by granting relief based on federal law not clearly established "*as of the time the state court render*[*ed*] *its decision*," *Greene*, 132 S. Ct. at 44 (internal quotation marks omitted).

identical sentence was not controlled by federal precedent involving a life-without-parole sentence. *See Lockyer v. Andrade*, 538 U.S. 63, 73–74 (2003). *Lockyer* reasoned a sentence of two consecutive terms of 25 years to life was "materially[]distinguishable" from a life-without-parole term because the petitioner actually "retain[ed] the possibility of parole," *id.* at 74, albeit when he was 87 years old, *see id.* at 79 (Souter, J., dissenting). So too here: because Demirdjian will be eligible for parole when he is 66 years old, his sentence arguably does not "share [any] characteristics with death sentences," *Miller*, 132 S. Ct. at 2466 (quoting *Graham*, 560 U.S. at 69), and thus does not necessarily trigger *Miller*'s requirements.[13]

Because fairminded jurists could disagree with Demirdjian that *Miller*'s requirements applied to his sentence, we hold he is not entitled to habeas relief on his Eighth Amendment claim.

---

[13] As the state notes, a recently enacted California statute entitles Demirdjian to "a meaningful opportunity to obtain release[]" at a hearing "during the 25th year of [his] incarceration" – when he is 41 years old. Cal. Penal Code § 3051(b)(3), (e). Because this new authority would not change our holding, we neither rely on it nor decide whether 28 U.S.C. § 2254(d)(1) permits us to do so. *Cf. Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits"). Our holding, however, does not foreclose Demirdjian's *eligibility* for a parole hearing after 25 years, or sooner, whether under California law or the California Supreme Court's interpretation of federal law.

## CONCLUSION

The judgment of the district court dismissing Demirdjian's habeas petition is **AFFIRMED.**

---

NOONAN, Circuit Judge, dissenting:

"Difficult" is the term chosen by the Supreme Court to characterize the process of a federal court reviewing a state criminal conviction under AEDPA. "Difficult" is not the same as "impossible." The Supreme Court has not cut off our review of state criminal convictions. Nor has Congress eliminated our review.

We are not engaged in an illusory examination of the proceedings that have taken place. We may not reverse the state court if "any theories or arguments could have supported" the state court's denial of relief. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). We are, therefore, bound to consider not only the actual reasoning of the state court, but the broader range of reasons that could support the result reached by that court. "Difficult," not impossible.

The standard set by the Supreme Court makes the test objective. The standard is not the subjective state of mind of the actual state judge but the objective test of what a properly functioning state judge would have done.

Under California law, a prosecutor of murder need not prove motive. *People v. Solomon*, 234 P.3d 501, 520 (Cal. 2010). But, the prosecutor must either prove intent or a conscious disregard for human life. *See People v. Lasko*,

999 P.2d 666, 668 (Cal. 2000). When the prosecutor attempts to prove motive and fails to do so, the lack of intent is drawn into question. Here, no motive for the defendant to kill was shown. What intent was shown?

\* \* \*

Michael Demirdjian was convicted at age fifteen of the brutal murders of thirteen-year-old Chris McCulloch and fourteen-year-old Blaine Talmo, Jr. The evidence against Demirdjian was so weak that his first trial ended with a hung jury. At his second trial, it took a jury five days to convict him. The prosecution's stated motive for Demirdjian to have committed the murders—a transferred desire for revenge— was risible. In fact, the evidence clearly pointed to a nineteen-year-old drug dealer with a burning need for cash as the killer. Yet fifteen years later, in spite of the prosecution's promise to the jury that other individuals who had participated in the killings would be brought to justice, Demirdjian is the only person to have been charged with and punished for the killings.

Had Demirdjian been convicted as the result of a fair trial, we would be obligated to overlook these problems. But his conviction was not the result of a fair trial. During closing argument, Demirdjian's attorney, Charles Mathews, sat silently while the prosecution repeatedly shifted the burden of proof onto the defense, referred to the fact that Demirdjian did not testify, and raised with the jury the specter of the 9/11 attacks and the Columbine mass murders. Demirdjian was effectively without the assistance of counsel while the prosecution made impermissible argument after impermissible argument. Due to this lack of effective

counsel, Demirdjian's petition for habeas relief should be granted.

## I

On Sunday, July 23, 2000, the bodies of Chris McCulloch, age thirteen, and Blaine Talmo, Jr., age fourteen, were found on an elementary school playground in La Crescenta, California. Both boys had died of multiple blunt force trauma. Next to Talmo's body, officers found a sixteen-pound rock stained with the blood of both of the victims. A twelve-by-ten-foot bench, weighing more than sixty pounds, lay across McCulloch's chest and neck.

The previous day, fifteen-year-old Michael Demirdjian had been playing basketball at the school with the two boys. There was physical evidence tying Demirdjian to the crime scene, including blood samples, a shoe print, and positive dog scent identifications. Demirdjian's first trial ended in a mistrial because the jury remained deadlocked following a week of deliberations. Eight jurors voted to convict, four to acquit. Demirdjian testified.

Jury selection for Demirdjian's second trial began the day before the terrorist attacks of September 11, 2001. Trial commenced six days later. The prosecution theorized that Demirdjian had committed the murders out of revenge because one of the victims had introduced him to Adam Walker, a nineteen-year-old drug dealer who subsequently stole hundreds of dollars from Demirdjian in a drug deal gone sour. According to the prosecution, Demirdjian spent a week unsuccessfully trying to ambush Walker to recover his money and exact revenge from him. The prosecution said that Demirdjian's chosen weapons were "beebee guns and knife,

*simulated weapons*."  But then, according to the prosecution, Demirdjian decided to rob and beat to death his two friends because they were young and "vulnerable."  He allegedly used his fists, a rock, and a park bench.

The defense acknowledged that Demirdjian was at the crime scene and witnessed the murders.  It maintained that he did not participate in them in any way.  Instead, the defense argued that Walker had killed the teens in a drug-induced fit of rage because he needed their money to pay a debt. Demirdjian did not testify.

On November 1, 2001, after five days of deliberations, the jury convicted Demirdjian on two counts of first-degree murder.  However, the jury acquitted him of the two robbery counts, rejecting the prosecution's primary theory that Demirdjian had conspired to commit robbery, resulting in felony murder.

## II

We review *de novo* a district court's denial of a petition for a writ of habeas corpus.  *Stanley v. Schriro*, 598 F.3d 612, 617 (9th Cir. 2010).  The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits our granting relief unless the state court's "adjudicat[ion] on the merits . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Because no California court has provided a reasoned decision on Demirdjian's claim of ineffective assistance of counsel ("IAC"), we must determine whether any theories or

arguments "could have supported" the state court's denial of relief. *Harrington*, 562 U.S. at 102. If so, we "must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.*

Trial counsel's failure to object to remarks made by the prosecution in closing argument and rebuttal may serve as the basis for an IAC claim. *Zapata v. Vasquez*, 788 F.3d 1106, 1112 (9th Cir. 2015); *Trillo v. Biter*, 769 F.3d 995, 1002 (9th Cir. 2014). The Supreme Court's decision in *Strickland v. Washington*, 466 U.S. 668 (1984), provides the clearly established federal law under which IAC claims arise. To prevail under *Strickland*, a defendant must show (1) that his counsel's performance was deficient and (2) that he was prejudiced by that deficient performance. *Id.* at 687. Based on analysis of *Strickland*'s deficient performance and prejudice prongs, I conclude that Demirdjian's counsel was constitutionally ineffective and that no reasonable argument exists to the contrary. Under the stringent standards established by AEDPA, habeas relief is appropriate.

## III

Under the first prong of *Strickland*, "the proper measure of attorney performance [is] simply reasonableness under prevailing professional norms." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quotation marks omitted). In evaluating reasonableness, we ask whether counsel could have had a tactical or strategic purpose guiding her conduct. *See Strickland*, 466 U.S. at 689–91.

## A.

Clearly established federal law as determined by the Supreme Court forbids attempts by the prosecution in a criminal case to shift the burden of proof of any elements of the crime to the defendant. *In re Winship*, 397 U.S. 358 (1970). The state bears the duty to establish guilt beyond a reasonable doubt. *Id.* at 362. In violation of this basic rule, the prosecution repeatedly indicated to the jury that Demirdjian bore the burden of providing evidence of his innocence.

At the outset of its closing argument, the prosecution told the jury it was going to "explain the theory of the prosecution and relation of the facts to the law." The prosecutor then told the jury that "it is always easier to attack a case than to defend it. And it is clear that the People have the burden of proof, and that will be an instruction that you receive. *But attack the case with real evidence, with competent evidence*, not meanness, not nastiness."

Having framed for the jury an approach in which the defense was required to produce "real" and "competent" evidence, the prosecution then repeatedly called on the defense to present "real evidence" during the remainder of its initial closing argument. After detailing for the jury evidence of multiple lacerations on Demirdjian's hands, the prosecutor demanded the defense produce evidence to refute that the lacerations were caused by using a rock to beat the two victims: "So I say to you, Mr. Mathews, explain it. What is the explanation for this other than mine? *What is the evidence that is offered other than ours.*" After discussing the blood stain evidence, the prosecution demanded the defense produce evidence to prove the blood stains did not

link Demirdjian to the murders: "So, Mr. Mathews, please explain to us, if you can, if you will, the unexplainable, which is how did Chris McCulloch's blood get on the doorjamb. *By competent, admissible evidence. Not by way of hypothesis, not by way of attorney spin, but by evidence admissible in a court of law.*"

In spite of these clear and repeated suggestions by the prosecution that the defense was required to provide "competent, admissible evidence," Mathews never once objected during the prosecution's initial closing argument. Following defense counsel's closing remarks, the prosecution in its rebuttal immediately repeated its framing of the approach it had urged on the jury: "I'm going to revisit all the questions that Mr. Barshop posed to Mr. Mathews, and I'm going to ask you whether they were answered. . . . I think that you'll find that most of the questions, if any at all, were not answered." After commenting on the prosecution's evidence (cuts and bruises on Demirdjian's hands) and permissibly asking a rhetorical question—"How does Mr. Mathews explain that?"—the prosecution repeated its impermissible demand: "Explain it with competent, reliable, admissible evidence." It again repeated this demand while criticizing Mathews's explanation: "That's not a good explanation; not based on reliable, competent evidence." And immediately repeated again: "[Mr. Mathews] has not explained it with competent, reliable, admissible evidence."

Nearing the end of its rebuttal, the prosecution continued to impermissibly catalogue the failures of the defense to explain the state's evidence, arguing the defense had produced no "competent, reliable, admissible evidence."

The prosecution may permissibly comment on the defense's failure to provide evidence to support its version of the story. *People v. Bradford*, 939 P.2d 259, 323 (Cal. 1997). Here, the prosecution impermissibly crossed the line, arguing the defense had provided no evidence to refute the *prosecution's* story. In doing so, the prosecution implicitly told the jury that Demirdjian bore the duty to establish his innocence beyond a reasonable doubt. The trial court silently acquiesced in these statements. The demand that Demirdjian prove his innocence violated Demirdjian's due process right "against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364.

**B.**

Demirdjian's attorney remained silent while the prosecution repeatedly commented on the fact that at his second trial Demirdjian did not testify. *Griffin v. California*, 380 U.S. 609 (1965), prohibits a prosecutor from commenting on a defendant's decision not to testify. Such "comment is unacceptable 'if it is manifestly intended to call attention to the [defendant's] failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify.'" *Rhoades v. Henry*, 598 F.3d 495, 510 (9th Cir. 2010) (quoting *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987)).

Comment is also unacceptable "if the defendant is the sole person who could provide information on a particular issue." *Id.*; *see also Griffin*, 380 U.S. at 614–15 (forbidding prosecutorial comment where an "inference of guilt" arises out of an accused's "failure to testify as to facts peculiarly within [his] knowledge").

Regarding the defense's theory that Demirdjian had injured his hands while playing basketball, the prosecutor commented:

> So I say to you, Mr. Mathews, explain it. . . . Where did these injuries on the defendant's hands come from?

Later, the prosecution asked:

> So, Mr. Mathews . . . how did Chris McCulloch's blood get on [Demirdjian's] doorjamb? *By competent, admissible evidence.* Explain it to us. Not by way of hypothesis, not by way of attorney spin, but *by evidence admissible in a court of law.*

And still later:

> Then [Demirdjian] lied to [Talmo's stepmother]. Have you heard an explanation for that?

Only Demirdjian could have supplied the answers to these questions. This line of questioning necessarily called attention to his decision not to testify. There can be "no fairminded disagreement" that such pervasive commentary violated *Griffin*. *White v. Woodall*, 134 S. Ct. 1697, 1706 (2014) (internal quotation marks omitted).

## C.

Trial counsel's failure to object when the prosecution sought to capitalize on the public hysteria that followed the

terrorist attacks of September 11, 2001, which had taken place less than a week before trial, only strengthens the conclusion that he was constitutionally ineffective. For instance, the prosecution emphasized that these murders were an act of "evil" and that "evil has no age barriers, no nationality barriers, nor boundaries." The prosecution also linked Demirdjian's alleged crime to "[t]errorism against the state," referenced the "World Trade Center attack," and reminded the jury of "Columbine" when asking rhetorically whether "kids kill kids." These appeals to jurors' emotions were clearly improper. *See United States v. Weatherspoon*, 410 F.3d 1142, 1149 (9th Cir. 2005) (condemning "prosecutorial statements designed to appeal to the passions, fears and vulnerabilities of the jury"). Again, Demirdjian's attorney raised no objections.

## D.

There were several bases for trial counsel to object. The question remains whether Mathews's failure to do so fell "within the wide range of reasonable professional assistance [that] might be considered sound trial strategy." *Tilcock v. Budge*, 538 F.3d 1138, 1146 (9th Cir. 2008).

"Absent egregious misstatements" by the prosecution, defense counsel's failure to object during closing argument is typically considered "a reasonable strategic decision" that falls within the "wide range of permissible professional legal conduct." *Cunningham v. Wong*, 704 F.3d 1143, 1159 (9th Cir. 2013). Here, the prosecution's clear and repeated statements that the defense was required to provide "competent, admissible evidence" were "egregious misstatements." These misstatements went beyond misstating facts—they instructed the jury to require that

Demirdjian provide evidence to counter the prosecution's case. The prosecution first framed for the jury an analytical approach that required the defense to "attack the case with real evidence, with competent evidence." Mathews's failure to object, and the court's silent acquiescence in the prosecution's demand, said one thing to the jury: You may find the defendant guilty if he did not provide evidence to refute the prosecution's case.

Defense attorneys may refrain from objecting for a wide variety of reasons, including a desire to avoid calling attention to unfavorable facts. *See id.* ("[Defense counsel's] decision not to object to [the prosecutor's] comments, possibly to avoid highlighting them, was a reasonable strategic decision."). No reasonable jurist could conclude that counsel's failure to object to clear instructions by the prosecution to the jury that shifted the burden of proof onto the defense falls within the "wide range of professional legal conduct." To be sure, withholding objection might be a reasonable strategy in the context of isolated errors or otherwise harmless commentary. *See id.* Here, however, it would have been readily apparent to any reasonable counsel after the first several burden-shifting statements that such improper commentary would not cease and, as a result, would be highly prejudicial to the client.

Similarly, Demirdjian's counsel sat through the prosecution's repeated *Griffin* violations yet failed to object despite numerous opportunities to do so. While in some cases we have recognized the strategic value in forgoing objection during opposing counsel's closing argument, such a tactic would have been unreasonable here after the prosecution's first several requests for information exclusively within Demirdjian's knowledge, and grossly

unreasonable upon counsel's discovery that the prosecution's strategy in its closing arguments was apparently to underscore Demirdjian's decision not to testify. *See id.* Yet defense counsel said not a word.

Defense counsel's failure to respond to the prosecution's statements was not a strategic decision taken to avoid highlighting unfavorable facts. The failure to object permitted the prosecution to lower its burden of proof by shifting the burden onto the defense, highlighted Demirdjian's choice not to testify, and allowed the prosecution to pander to the jury's heightened sensibilities. No possible defense strategy could explain these failures.

## IV

We may not grant habeas relief unless counsel's failure satisfies *Strickland*'s second prong, such that the prosecution's comments resulted in prejudice to the defendant. *Zapata*, 788 F.3d at 1116–17. Under *Strickland*, "the likelihood of a different result [absent counsel's deficient performance] must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. On habeas review, the question is whether it would have been unreasonable for a state court to have concluded "[the defense's] evidence of prejudice fell short of this standard." *Id.*

"[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Considering "the totality of the evidence," *id.* at 695, absent counsel's ineffective performance, there is a reasonable probability that at least one juror would have resisted a guilty verdict, just as four jurors did in

Demirdjian's first trial. *See Vega v. Ryan*, 757 F.3d 960, 974 (9th Cir. 2014) (finding *Strickland* prejudice because of "a reasonable probability that at least one juror would have struck a different balance" (citation and quotation marks omitted)).

This is not a case where the evidence of the defendant's guilt was otherwise overwhelming. The most significant weakness in the prosecution's case was its inability to establish a plausible motive. The prosecution permissibly asked the jury to apply its common sense as it analyzed the case, yet the prosecution's theory of Demirdjian's motive defied any reasonable application of common sense. According to the prosecution, Demirdjian and Damian Kim, angered by being robbed in a drug deal by nineteen-year-old Adam Walker, spent a week unsuccessfully trying to ambush Walker to recover their money and exact revenge. Their chosen weapons: "beebee guns and knife, *simulated weapons*." But then, according to the prosecution, when Demirdjian's attempts to ambush Walker failed, he decided to turn on his own friends, Chris McCulloch and Blaine Talmo, in an attempt to rob them of $200. During the course of this robbery, the prosecution alleged, Demirdjian beat the two boys to death. Demirdjian supposedly put aside the beebee guns and knife and simulated weapons, and instead used his fists and a rock and a park bench to bludgeon Chris and Blaine, simply because they were younger and more vulnerable. It is no small wonder the prosecution repeatedly emphasized that it was not required to prove motive to the jury.

Several problems with the physical evidence linking Demirdjian to the murders also highlight the weakness of the prosecution's case. It was only after several inconclusive

attempts and a tip from Blaine Talmo's stepmother that the officers connected Demirdjian to the crime using dog scent evidence.  Ultimately, however, the defense's expert discredited this evidence as likely having been influenced by the dog handlers' own methodological errors.  What is more, the defense identified deficiencies in the State's initial DNA testing, which failed to implicate Demirdjian at all.

Finally, the jury heard evidence implicating Walker as the murderer, consistent with the defense's narrative.  Blood was found on Walker's shoes and he had scrapes on his hands, arms, and back, and bruises on his leg.  Incriminating evidence was found at Walker's residence, including washed rugs, damp and discolored clothes, gloves, a hand towel, and a newspaper article about the crimes.  Evidence also suggested that Walker had told his friend about the murders several hours before the police discovered the victims' bodies.

No reasonable jurist could dispute the substantial weaknesses in the prosecution's case.  These weaknesses explain the jury's difficulty in reaching a verdict at both of Demirdjian's trials.  As a result, there is a reasonable probability that trial counsel's failure to object to the prosecution's highly improper attempts at burden shifting, multiple *Griffin* errors, and pleas to the jurors' passions influenced the jury's verdict.  Fairminded jurists could not disagree.

* * *

I would reverse the district court's denial of Demirdjian's habeas petition and remand with instructions to grant a writ requiring the State to release him from custody unless it

initiates new trial proceedings within a reasonable period of time as determined by the district court.